737 F.2d 229
 Ingrid CROCE, Individually, as heir of the Estate of James
Joseph Croce, also known as Jim Croce, Plaintiff-Appellee,
v.
Philip S. KURNIT, Thomas R. Picardo, Jr., a/k/a Tommy West,
Dennis Minogue, a/k/a Terry Cashman, Cashman, Pistilli &
West, Blendingwell Music, Inc., Cashwest Productions, Inc.,
and Lifesong Records, Inc., Defendants,
Blendingwell Music, Inc. and Cashwest Productions, Inc.,
Defendants-Appellants,
Time In A Bottle, Inc., Additional Defendant on Counterclaims.
 No. 241, Docket 83-7402.
 United States Court of Appeals,
Second Circuit.
 Argued Nov. 21, 1983.
Decided June 14, 1984.
 
 Lawrence I. Kaplan, New York City, for plaintiff-appellee.
 Leonard M. Marks, New York City (Terri E. Simon, Gold, Farrell & Marks, New York City, on the brief), for defendants-appellants.
 Before LUMBARD, MANSFIELD and KEARSE, Circuit Judges.
 KEARSE, Circuit Judge:
 
 
 1
 Defendants Blendingwell Music, Inc. ("Blendingwell"), and Cashwest Productions, Inc. ("Cashwest"), appeal from so much of a judgment of the United States District Court for the Southern District of New York, Robert W. Sweet,Judge, as granted certain claims asserted by plaintiff Ingrid Croce as the heir of the popular singer and songwriter Jim Croce who died in 1973 (collectively "Croce") for royalties due Croce, and dismissed a counterclaim asserted by Blendingwell to recover alleged overpayments of royalties to Croce. Following a jury trial as to certain issues and a bench trial as to others, the court entered judgment in favor of plaintiff in the total amounts of $348,359.93 against Blendingwell and $359,008.81 against Cashwest; the court dismissed Blendingwell's counterclaim for $334,024 in royalty overpayments to Croce. On appeal, Blendingwell and Cashwest attack so much of the judgment as awarded plaintiff a total of $102,543 against Blendingwell and $181,161 against Cashwest, on the grounds that the court erred in not submitting certain questions to the jury and in not upholding Blendingwell's counterclaim as a matter of law. Finding no merit in these contentions, we affirm the judgment. 565 F.Supp. 884.
 
 I. BACKGROUND
 
 2
 Blendingwell is a corporation of which defendant Philip S. Kurnit was president and defendants Thomas R. Picardo, Jr., a/k/a Tommy West ("West"), and Dennis Minogue, a/k/a Terry Cashman ("Cashman"), were officers. Cashwest is a corporation of which Kurnit, Cashman, and West were also officers. The pertinent events and controversies are summarized below.
 
 A. The Agreements and the Events
 
 3
 In 1968 Jim Croce entered into contracts with Blendingwell pursuant to which Blendingwell became the exclusive publisher of his compositions and his personal manager, and a contract with a corporate predecessor of Cashwest (hereinafter also "Cashwest") for the recording of his compositions. Jim Croce and Blendingwell executed a document entitled "Standard Songwriters Contract" (hereinafter "Songwriting Agreement"), paragraph 3 of which provided that Blendingwell would pay Croce royalties in the amount of, inter alia, three cents per copy of pianoforte copy (more commonly called "sheet music") sold by Blendingwell, "50% of the net sums actually received" by Blendingwell from mechanical licenses, and 50% of the net amounts received by Blendingwell from any sources or rights not specifically provided for:
 
 
 4
 3. In consideration of this agreement, and conditioned upon the compliance by the WRITER with each and every of the terms, conditions and warranties of this agreement to be performed and observed, the COMPANY agrees to pay, during the term of the copyright owned by it, to the WRITER ..., and the WRITER will accept in full payment the following:
 
 
 5
 A. 03cents per copy for each and every complete pianoforte copy of the composition sold by the COMPANY, and paid for in the United States of America and Canada.
 
 
 6
 * * *
 
 
 7
 E. 50% of the net sums actually received by the COMPANY from mechanical, transcription and synchronization licenses.
 
 
 8
 * * *
 
 
 9
 G. 50% of the net sums actually received from any other sources or rights now known or which may hereafter come into existence not specifically provided for herein ....
 
 
 10
 New York law was to govern matters of interpretation, performance, and breach.
 
 
 11
 In 1969, Blendingwell entered into an agreement with Robbins Music Corp. ("Robbins") granting Robbins a license to sell Croce compositions in sheet music form. Until 1976 Blendingwell paid Croce 50% of the amounts it received from Robbins under this agreement. In 1976, Blendingwell commenced to pay Croce instead three cents per copy of sheet music sold by Robbins. In addition, Blendingwell claimed that prior amounts paid to Croce for sheet music sales by Robbins were overpayments to the extent that they exceeded three cents per copy, and it accordingly deducted $70,992 from Croce's then-current royalties in order to recoup the alleged overpayments.
 
 
 12
 Jim Croce's career had begun to flourish in 1972. In that year Cashwest and Blendingwell entered into agreements with ABC Records, Inc. ("ABC"), and ABC's affiliate, Wingate Music Corp. ("Wingate"), giving ABC a mechanical license, i.e., the right to manufacture, distribute, and sell Croce's recordings, and requiring ABC to pay royalties to Cashwest and Blendingwell. Under these agreements (collectively the "ABC Agreements"), Blendingwell "assigned to [Wingate] 50% of Blendingwell's share in publishing income generated by the Croce compositions under the Songwriting Agreement." (Appellants' brief on appeal at 7.)[1] Thus, if Blendingwell received royalties for Croce compositions from a record company other than ABC, it would pay 50% to Croce, keep 25%, and pay 25% to Wingate. As to the royalties payable to Blendingwell by ABC, Blendingwell agreed that ABC could pay 25% of the gross amount directly to Wingate and simply remit to Blendingwell the 75% remainder.
 
 
 13
 Thereafter, until 1980, Blendingwell paid Croce as royalties under the Songwriting Agreement 50% of the gross amounts ABC was required to pay to Blendingwell. In 1980, however, Blendingwell decided to pay plaintiff instead only 50% of ABC's 75% cash payments made to Blendingwell and to exclude from consideration the amounts paid by ABC to Wingate for Blendingwell's account.
 
 
 14
 In the meantime, in the mid 1970's a controversy had arisen between Cashwest and Blendingwell on the one hand and ABC on the other, and Cashwest engaged accountants to audit ABC's royalty payments through December 31, 1975. The auditors' reports stated that ABC owed Cashwest more than $4.5 million and owed Blendingwell some $223,000. The audits also revealed that Blendingwell owed Wingate's corporate successor (hereinafter also "Wingate") approximately $326,000 under the ABC Agreements. In 1979, Cashwest, Blendingwell, ABC, and Wingate entered into a settlement agreement pursuant to which, inter alia, ABC paid Cashwest some $1,920,000 for past royalties, and both ABC's debt of $223,000 to Blendingwell and Blendingwell's debt of $326,000 to Wingate were extinguished.
 
 
 15
 B. The Present Lawsuit and the Decision Below
 
 
 16
 Ingrid Croce commenced the present lawsuit in 1978 against, inter alia, Blendingwell, Cashwest, Kurnit, West, and Cashman, claiming principally that the defendants had acted unconscionably and had breached their fiduciary duties to Croce. Jurisdiction was based on diversity of citizenship.
 
 
 17
 The second amended complaint, upon which the parties proceeded to trial, asserted three claims that are at issue on this appeal: (1) a claim against Blendingwell for 50% of the gross amounts payable to it by ABC under the ABC Agreements since 1979 ("ABC Royalty claim"); (2) a claim against Cashwest on the ground that the extinguishment of Blendingwell's $326,000 debt to Wingate in 1979 occasioned a reduction in ABC's royalty payment to Cashwest and that, under the Croce-Cashwest recording contract, Croce was entitled to 5/9 of the amount of the reduction ("ABC Settlement claim"); and (3) a claim against Blendingwell for 50% of the net amounts received by Blendingwell for sales of sheet music by Robbins, less the three-cents per copy already paid. With respect to Croce's ABC Royalty claim, Blendingwell counterclaimed for $334,024 in claimed overpayments under the ABC Agreements between 1972 and 1980.
 
 
 18
 These contract claims were tried to a jury. After the close of the evidence the court directed a verdict in favor of Croce for $31,591 on the ABC Royalty claim and for $70,992 on the sheet music claim, and it dismissed Blendingwell's counterclaim. The ABC Settlement claim was submitted to the jury on special interrogatories agreed to by the parties. The jury found that as a result of the extinguishment of Blendingwell's debt to Wingate, ABC had reduced its royalty payment to Cashwest. The jury had not been asked to determine the amount by which ABC had reduced its payment, and the court itself found that the amount of the reduction was $326,000 and that Croce was entitled to recover $181,161. Appellants' motion to vacate the court's decisions was denied.
 
 
 19
 Blendingwell and Cashwest have appealed these portions of the judgment.[2] Cashwest contends that after the jury found that ABC had reduced its payment to Cashwest on account of the forgiving of Blendingwell's indebtedness to Wingate, the matter of the amount of that reduction should have been presented to the jury for determination. Blendingwell contends that the ABC Royalty claim should have been submitted to the jury or decided in Blendingwell's favor as a matter of law; and it contends that the sheet music claim should have been submitted to the jury. We have considered all of appellants' arguments in support of these contentions and find them to be without merit.
 
 II. DISCUSSION
 A. The ABC Settlement Claim
 
 20
 The parties agree that Croce was to receive 5/9 of the amounts received by Cashwest from ABC as royalties under the ABC Agreements. Croce claimed that as a result of the settlement among ABC, Cashwest, Blendingwell, and Wingate, ABC reduced the amount of its royalty payments to Cashwest by $326,000, the amount of Blendingwell's forgiven indebtedness to Wingate, and that Croce was therefore entitled to 5/9 of $326,000. Cashwest, on the other hand, pointed out that (a) the audits revealed that ABC was indebted to Blendingwell in the amount of $223,000, (b) there was no dispute that Blendingwell had already paid Croce royalties on this $223,000, and (c) this debt of ABC was also forgiven in the settlement. Accordingly, Cashwest argued that Croce was entitled to at most 5/9 of $103,000 (the difference between the two sums forgiven), or $57,000.
 
 
 21
 Croce's claim was submitted to the jury in the form of the following special interrogatory:
 
 
 22
 Did ABC reduce its royalty payments to Cashwest as a consequence of the settlement of the Blendingwell claim against ABC?
 
 
 23
 (Interrogatory No. 3.) The jury responded "yes." There was, however, no follow-up interrogatory asking the jury to determine the amount by which ABC had reduced its royalty payments, as the parties had not, prior to the submission of the case to the jury, requested such an interrogatory.
 
 
 24
 Following the jury's special verdict, Cashwest requested that a new question as to the amount of the ABC reduction be put to the jury. Croce's counsel initially did not object but thereafter agreed with the court's view that a finding of a reduction in the whole amount of $326,000 was implicit in the jury's answer to Interrogatory No. 3. After further colloquy and reflection, the court decided not to ask the jury another interrogatory as to the amount of the reduction and instead elected to determine that issue itself. The court's finding was that ABC had reduced its royalty payments by $326,000. Cashwest does not contend on appeal that this finding was "clearly erroneous," Fed.R.Civ.P. 52(a), but urges only that we reverse the judgment on the ground that the court was required to submit the matter to the jury. We see no error in the court's actions. Fed.R.Civ.P. 49(a); Cote v. Estate of Butler, 518 F.2d 157, 160 (2d Cir.1975).
 
 
 25
 Rule 49(a) provides that the court may require the jury to return a special verdict in the form of answers to written interrogatories and provides that the court shall give the jury such instruction as is necessary to enable it to answer the interrogatories. The rule states that
 
 
 26
 [i]f in so doing the court omits any issue of fact raised by the pleadings or by the evidence, each party waives his right to a trial by jury of the issue so omitted unless before the jury retires he demands its submission to the jury. As to an issue omitted without such demand the court may make a finding
 
 
 27
 ....
 
 
 28
 Since Cashwest acknowledges that the jury "was not asked to decide" the amount of the reduction (Appellants' brief on appeal at 35), and since the record is clear that Cashwest made no objection to the omission of such a question until after the jury had retired, and indeed had returned its verdict, the right to challenge that omission was waived.
 
 
 29
 The authorities relied on by Cashwest for the proposition that no waiver occurred are inapposite, as all of them involved either the failure of the trial judge to remedy a flaw called to his attention before the jury retired, see, e.g., Huddleston v. Herman & MacLean, 640 F.2d 534, 550 (5th Cir.1981), aff'd in part and rev'd in part, 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983), or the failure of the jury to answer one or more of the questions actually put to it, see, e.g., Franki Foundation Co. v. Alger-Rau & Associates Inc., 513 F.2d 581 (3d Cir.1975). We are aware of no case reversing a decision by the trial judge not to put a postverdict question to the jury where none had been timely requested.
 
 
 30
 Nor are we persuaded to reach a different result merely because Croce's attorney initially did not object to giving the jury a new postverdict question. Since no timely request or objection had been made by Cashwest, the matter of whether to submit a postverdict interrogatory was wholly within the discretion of the trial judge. Rule 49(a) expressly allows the trial judge to make findings as to omitted issues, and we see no abuse of discretion in the court's decision here to make such a finding rather than to submit a new question to the jury.
 
 B. The ABC Royalty Claim
 
 31
 In support of its contention that the court improperly dismissed its counterclaim and directed a verdict against it on the ABC Royalty claim, Blendingwell points out that the Songwriting Agreement required it to pay Croce "50% of the net sums actually received by the COMPANY [i.e., Blendingwell] from mechanical ... licenses," (Songwriting Agreement p 3.E.), and it contends that since it physically received from ABC only 75% of the gross amount payable by ABC, it was required to pay Croce only 37 1/2% of that gross amount, i.e., one half of ABC's cash payments to it. Blendingwell argues principally that (1) the term "net sums actually received" is so clear that the court should have directed a verdict in its favor instead of against it, (2) as the term was unambiguous the court should not have considered extrinsic evidence in order to interpret the term, and (3) if the term was not sufficiently clear and unambiguous to warrant judgment as a matter of law for Blendingwell or to warrant the exclusion of extrinsic evidence of the parties' intent, the matter should have been submitted to the jury for determination. We find no merit in any of Blendingwell's arguments.
 
 
 32
 The court ruled that the term "net sums actually received by Blendingwell" must be construed to include also sums that Blendingwell constructively received. Implicit in this ruling was the view that the contract term was not unambiguously limited to amounts "physically received," or received in cash. We see no error in that view. No publisher wishes to pay royalties on items it sells but for which it is unable to collect payment. The phrase "sums actually received" thus could easily have been intended to mean "sums realized," thereby relieving the publisher of any obligation to pay royalties on amounts that were owing but uncollected. Since a seller need not physically receive a cash payment in order to collect compensation for items sold, the court was justified in concluding that the phrase "net sums actually received" was not clearly limited, as Blendingwell contended, to sums physically received or received in cash. Accordingly, the court was entitled to admit extrinsic evidence in order to fathom the intentions of the parties in using that term. See, e.g., 67 Wall Street Co. v. Franklin National Bank, 37 N.Y.2d 245, 248-49, 371 N.Y.S.2d 915, 918, 333 N.E.2d 184, 186 (1975).
 
 
 33
 The evidence relied on by the trial court in concluding that the parties intended the term "actually received" to mean "realized" and to include sums constructively received was overwhelming. First, there was the parties' practical construction of that term. From 1972 until 1980, Blendingwell paid Croce 50% of the total amounts owing to it by ABC--both of the sums received from ABC in cash and of the sums constructively received through ABC's payments to Wingate on its behalf. It was not until well after this lawsuit was under way that Blendingwell decided to advance the interpretation that it was to pay Croce only 50% of the 75% paid to it by ABC in cash, and no part of the amounts ABC paid to Wingate to satisfy Blendingwell's debt. Given this prior practice and the substantial sum involved--$334,000--it is the parties' practical construction of the contract prior to the commencement of the litigation that is compelling. See, e.g., Old Colony Trust Co. v. Omaha, 230 U.S. 100, 118, 33 S.Ct. 967, 972, 57 L.Ed. 1410 (1913) ("Generally speaking, the practical interpretation of a contract by the parties to it for any considerable period of time before it comes to be the subject of controversy is deemed of great, if not controlling, influence."); William C. Atwater & Co. v. Panama Rail Road Co., 255 N.Y. 496, 501, 175 N.E. 189, 191 (1931) ("The courts in determining the obligations of a contract should, when possible, apply the same measure as the parties have applied in performing their obligations."); Woolsey v. Funke, 121 N.Y. 87, 92, 24 N.E. 191, 192 (1890) (" 'There is no surer way to find out what parties meant than to see what they have done.... Parties in such cases often claim more, but rarely less than they are entitled to.' ") (quoting Insurance Co. v. Dutcher, 95 U.S. 269, 273, 24 L.Ed. 410 (1877) ).
 
 
 34
 Further, there was clear and unequivocal evidence that Blendingwell's actions from 1972 to 1980 in paying Croce 50% of the net sums realized did not result from bookkeeping errors but reflected Blendingwell's conscious contemporaneous interpretation of its contractual obligation to Croce. In 1975, a tape-recorded conference was held among, inter alios, Ingrid Croce and Blendingwell's president Kurnit, in which Kurnit told Ingrid Croce that Blendingwell had given up one-half of its own share of the royalties and had not asked Croce to share the burden by accepting merely a 50-50 division with Blendingwell on the remaining 75%:
 
 
 35
 [Kurnit]: I can tell you that the majority of the monies earned under the existing contracts I believe have gone to in artist royalties is Jim Croce. The royalties-- 5/9th of the royalty coming from ABC was Jim's share and [Cashwest's predecessor] received a smaller share than Jim received. That was something--we also gave up half of our publishing in order to make the deal. Blendingwell Music has operated on 50% of the publishing income.
 
 
 36
 [Croce]: --With ABC?
 
 
 37
 [Kurnit]:--Yeah, in order to make the deal and in order--we made that sacrifice. We never turned around to Jimmy and could have at that point of time and could have at that point of time [sic] cause we--everybody desperately needed a deal and there were you know. We had two alternatives. Turning around to Jimmy and saying Jim we've had to sacrifice half of our share let's consider that the 3/4 of everything that remained 1/2 the publishers and the full writers as being one pot and go 50/50 on that. We didn't do that--we just don't do that. We made the sacrifice in order to have the result and in order to what had--what was really right.
 
 
 38
 (Plaintiff's Exhibit 78A at 32-33; emphasis added).[3]
 
 
 39
 It is noteworthy that the nature of Blendingwell's undertaking to Wingate has uniformly been described by Blendingwell as its assignment to Wingate of one-half of Blendingwell's own share of the royalties. Thus, the ABC Agreements themselves stated that Blendingwell would pay Wingate 50% of Blendingwell's Croce receipts calculated after deduction for royalties owing to Croce (see note 1 supra ); and, as revealed in the 1975 taped conversation, Kurnit told Ingrid Croce, "we also gave up half of our publishing" (Plaintiff's Exhibit 78A at 32; emphasis added). Even appellants' brief on appeal states that "Blendingwell assigned to [Wingate] 50% of Blendingwell's share ...." (Appellants' brief on appeal at 7; emphasis added.) Blendingwell has not pointed to a shred of support, either in the trial record or in any papers supporting its motion to vacate the directed verdict, for the proposition that Blendingwell had given Wingate instead one-quarter of its own share plus one-quarter of Croce's.
 
 
 40
 Finally, we are unpersuaded by Blendingwell's argument that the ABC agreements could have been structured so as to make its payments to Wingate expenses to be deducted before Croce's share of the net was computed. Blendingwell's argument proves too much, both factually and doctrinally. In fact the ABC Agreements were not so structured. The Participation Agreement expressly defined Blendingwell's "Net Income," of which Blendingwell was to pay Wingate half, as an amount remaining after Croce's royalties were deducted. Plainly, if Croce's royalties were to be deducted first, in order to compute Blendingwell's obligation, Croce's share was not to be computed after a deduction for Blendingwell's obligation.
 
 
 41
 Nor do we view Blendingwell's present construction of its agreement to pay half of its share of royalties to Wingate as significantly different in effect from the construction unsuccessfully advanced with respect to a similar provision by the publisher in Nolan v. Sam Fox Publishing Co., 499 F.2d 1394 (2d Cir.1974), aff'g 300 F.Supp. 1311 (S.D.N.Y.1969). In Nolan, the publisher ("Fox") had agreed to pay Nolan 1/3 "of all royalties received by the 'Publisher' " for Nolan's song "Tumbling Tumbleweeds." The publisher assigned its interests in the song to Williamson Music, Inc. ("Williamson"), in return for Williamson's agreement to pay the publisher royalties in amounts varying between one-half and two-thirds of Williamson's gross receipts. 300 F.Supp. at 1314. Nolan sought an accounting of sums received by both the publisher and Williamson, and his claim was upheld in the district court and on appeal. We noted that "under the interpretation of the contract suggested by Fox, the continual dilution of earnings payable to Nolan could be achieved through successive assignments," 499 F.2d at 1399, and we considered it unlikely that the parties had intended to make the composer vulnerable to such a dilution. Id. Similarly, under Blendingwell's interpretation of the Songwriting Agreement, Blendingwell could have instructed ABC to pay part of the gross royalties to any of Blendingwell's creditors, or indeed to any other payee selected by Blendingwell, and claimed to owe Croce only 50% of the sums sent by ABC to Blendingwell in cash. We do not believe such an intention could rationally be imputed to the parties.
 
 
 42
 The procedural principles governing the court's treatment of these issues are not in substantial dispute. The trial court may direct a verdict, and we may uphold a directed verdict, only if "the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable men could have reached." Simblest v. Maynard, 427 F.2d 1, 4 (2d Cir.1970); see Konik v. Champlain Valley Physicians Hospital Medical Center, 733 F.2d 1007 at 1013 (2d Cir.1984); cf. Blum v. Fresh Grown Preserve Corp., 292 N.Y. 241, 246, 54 N.E.2d 809, 811 (1944) (evidence is insufficient to withstand a directed verdict "where no reasonable man could accept it and base an inference upon it"); D'Angelo, Forrest & Co. vs. Franklin United Life Insurance Co., 65 A.D.2d 766, 767, 409 N.Y.S.2d 784, 785 (2d Dep't 1978) (directed verdict improper where, "[t]aking all the evidence presented as true, and drawing all reasonable inferences therefrom, it cannot be said that no rational process existed by which the jury could have found for the" nonmoving party). Application of this principle to an issue of contract construction means that if the evidence so clearly establishes what interpretation should be given to the contract that reasonable minds could not conclude that it could be interpreted in any other way, a directed verdict on the issue is proper. See W.S. Hayes, Inc. v. Public Service Mutual Insurance Co., 12 A.D.2d 989, 990, 212 N.Y.S.2d 89, 90 (1961) ("The question of what meaning should be given to the words of a contract is ordinarily a question of fact but 'if the evidence is so clear that no reasonable man would determine the issue before the court in any way but one, the court will itself determine the issue.' ") (quoting 3 A. Corbin, Corbin on Contracts Sec. 554, at 222 (1960) ).
 
 
 43
 We conclude that the directed verdict in favor of Croce on the ABC Royalty claim and the dismissal of Blendingwell's counterclaim for the alleged overpayments were proper. In light of the language and consistent characterization by Blendingwell of its agreement with Wingate, the evidence of the parties' actual practice in performing the Songwriting Agreement, and the evidence of Blendingwell's president's recorded statement, no rational juror could have concluded that the parties intended that Blendingwell be obligated to pay Croce only 37 1/2% of the royalties realized by Blendingwell from the mechanical license to ABC.
 
 C. The Sheet Music Claim
 
 44
 These procedural principles also govern Blendingwell's defense to Croce's sheet music claim. Paragraph 3.A. of the Songwriting Agreement provided that Croce was to be paid three cents per copy of sheet music "sold by the COMPANY." Paragraph 3.G. provided that as to sums received from any sources or rights "not specifically provided for herein," Croce was to receive 50%. The court ruled that the catchall provision controlled the royalties owed to Croce on sheet music sold by Robbins because it was incontrovertible that the Songwriting Agreement defined "COMPANY" as Blendingwell, that Blendingwell did not sell the sheet music for which it withheld royalties, and that there was no other provision specifically governing payment to Croce for sheet music sold by a person other than Blendingwell. The court thus directed a verdict in favor of Croce for $70,992, the amount withheld by Blendingwell as the difference between three cents per copy and the 50% royalties actually paid prior to 1976.
 
 
 45
 Blendingwell attacks this ruling on the grounds that (1) when a contract's specific provision conflicts with a more general provision, the specific is to control; (2) the custom in the industry was to pay songwriters three cents per copy of sheet music; and (3) the court's narrow interpretation of "COMPANY" in connection with paragraph 3.A. was inconsistent with its interpretation of "COMPANY" in paragraph 3.E. in connection with the ABC Royalty claim. We see no merit in any of these contentions.
 
 
 46
 First, we find no factual predicate for application of the principle that where a specific contract provision conflicts with a more general provision, the specific provision controls. There is no conflict between the provision for a three-cent royalty for a product sold by Blendingwell and the provision for a different loyalty for a product sold by a person other than Blendingwell. Since there is no inconsistency, Blendingwell's maxim does not come into play.
 
 
 47
 Second, evidence of industry practice may not be used to vary the terms of a contract that clearly sets forth the rights and obligations of the parties. In re Western Union Telegraph Co., 299 N.Y. 177, 184-85, 86 N.E.2d 162, 166 (1949); Cable-Wiedemer, Inc. v. Friederich & Sons Co., 71 Misc.2d 443, 445, 336 N.Y.S.2d 139, 141 (Monroe County Ct.1972). Here, the Songwriting Agreement plainly stated in paragraph 3.A. that sheet music sales by Blendingwell were to result in a three-cent royalty and in paragraph 3.G. that sums received from other sources not specifically provided for in the contract were to result in a 50% royalty. The industry custom as described to us by Blendingwell would have been used not to illuminate an unclear term but instead to modify the provision of paragraph 3.A. to have it read, in effect, "sheet music sales by Blendingwell or any other person who is its licensee." This is not a permissible use of industry custom evidence. Further, we do not see that the evidence of industry custom supported even that reinterpretation. The expert on whose testimony Blendingwell relies testified that when an agreement contained a provision for royalties on sheet music sold by the publishing company, the industry practice was to include a provision that sheet music sold by persons other than the company would result in a royalty of 50%.
 
 
 48
 Finally, there is no merit in Blendingwell's contention that the trial court interpreted "COMPANY" for purposes of the sheet music claim inconsistently with its interpretation of that term for the purposes of the ABC Royalty claim. The term "COMPANY" was not at issue in connection with the ABC Royalty claim. What was at issue was whether actual receipt by Blendingwell meant merely physical possession by Blendingwell or instead meant realization by Blendingwell. The conclusion that a company has constructively received income it has directed its debtor to pay to its creditor does not mean that the court considered either the company and its debtor or the company and its creditor to be one in the same person.
 
 
 49
 At trial there was no dispute that the sheet music in question was sold by Robbins, an independent music publisher, and not by Blendingwell. Further, the court's view as to the clear meaning of the contract terms governing royalties for sheet music sold by Robbins is confirmed by the fact that for the better part of a decade Blendingwell actually paid Croce a royalty of 50% of the net sums it received from Robbins. We conclude that the trial court did not err in directing a verdict for Croce on the sheet music claim.
 
 CONCLUSION
 
 50
 The judgment of the district court is affirmed.
 
 
 
 [1]
 The pertinent provision of the assignment agreement reads as follows:
 
 
 [5]
 Company [i.e., Blendingwell] shall pay to [Wingate] fifty (50%) percent of the Net Income actually received and derived by Company from [Croce] Composition[s]
 (Participation Agreement dated April 25, 1972, between Blendingwell and Wingate.) "Net Income" was defined as "the gross receipts derived by Company from the Composition[s], less ... [r]oyalties and other sums which shall be paid by Company to the Composer pursuant to the provisions of the songwriters' contracts between Company and the Composer," and less certain expenses. (Id.)
 
 
 [2]
 After a bench trial on other issues, the court dismissed most of Croce's claims for breach of fiduciary duty. Although Croce filed a notice of cross-appeal from that ruling, the notice was withdrawn and those claims are not involved in this appeal
 
 
 [3]
 Although Cashwest states that the tape and transcript of this conversation were introduced in connection with a different issue, we find no indication in the record that their offer or receipt in evidence was in any way limited. The evidence was thus available for consideration on any issue to which it was relevant