B.J. THOMAS, Gene F. Pitney, Shirley Owens Alston Reeves, Beverly Lee, Doris Coley Jackson, Vernon McFadden, and Hank Ballard, Plaintiffs,

v.

Gayron M. ("Moe") LYTLE, Gusto Records, Inc., GML, Inc., Marshall E. Sehorn, White Dog, Ltd., and Red Dog Express, Inc., Defendants.

No. 3:95–0347.

United States District Court, M.D. Tennessee, Nashville Division.

July 18, 2000.

Scott Kendall Haynes, Boult, Cummings, Conners & Berry, Nashville, TN, Ira G. Greenberg, Edwards & Angell, New York City, for plaintiffs.

David W. Showalter, Law Offices of David W. Showalter, PC, Bellaire, TX, for Donald M. Daily, Harold w. Daily, Jr., intervenors.

Nader Baydoun, Baydoun & Reese, Nashville, TN, Jay Scott Bowen, Bowen, Riley, Warnock & Jacobson, PLC, Nashville, TN, for Gayron Moe Lytle, Gusto Records, Inc., GML, Inc., defendants.

S. Ralph Gordon, Gordon, Martin, Jones & Harris, Nashville, TN, for Marshall E. Sehorn, White Dog, Ltd., Red Dog Express, Inc., defendants.

## MEMORANDUM

TRAUGER, District Judge.

This bench trial was on a claim by the plaintiffs for unpaid royalties over an eight-year period. In accordance with Rule 52 of the Federal Rules of Civil Procedure, the court enters judgment for the plaintiffs and sets forth the following findings and conclusions.

## FINDINGS OF FACT

All of the plaintiffs, except for Plaintiff Vernon McFadden, Jr.,[1] are recording artists and entertainers. (Trial Transcript ("Tr.") at 53, 121, 318, 333, 687) Plaintiffs Shirley Owens Alston Reeves, Beverly Lee, and Doris Coley Jackson[2] are the remaining members of the musical group known as "The Shirelles." (Tr. at 122) Defendant Gayron M. Lytle is the president and sole shareholder of Defendants Gusto Records Inc. and GML Inc. (Tr. at 443) Gusto is a Tennessee corporation with its principal place of business at 1900 Elm

---

1. Plaintiff McFadden is the successor in interest to Addie Harris, who was one of the original members of the music group "The Shirelles." (Tr. at 156)

2. During the course of the bench trial, Plaintiff Doris Coley Jackson died. On March 13, 2000, The Doris Coley Jackson Family Trust, Agnes Coley, Trustee, was substituted for Plaintiff Jackson (Docket No. 270).

Hill Pike in Nashville, Tennessee. (Tr. at 442) GML is a Missouri corporation with its principal place of business at 1900 Elm Hill Pike in Nashville, Tennessee. (Tr. at 442)

All plaintiffs except Hank Ballard previously litigated claims against GML and Gusto in this district in *Thomas, et al. v. Gusto Records, Inc. and GML, Inc.*, 3:87-0975 (Higgins, J.). In that action, the plaintiffs were awarded a judgment, later affirmed by the Sixth Circuit Court of Appeals in *Thomas v. Gusto Records, Inc.*, 939 F.2d 395 (6th Cir.1991). The parties in that action then entered into an agreement in February 1992 concerning the payment of the judgment entered by Judge Higgins and the defendants' future obligations to the plaintiffs (the "Thomas Agreement"). (Trial Ex. 3)

With respect to future royalty obligations, the Thomas Agreement provides:

[Record Company][3] is obligated to pay artists' royalties to the applicable recording Artist ...; and that that obligation is five percent of ninety percent of retail suggested list price times quantity sold for product manufactured by or for Record Company, and one-half (50%) of such amount with respect to product manufactured or sold by or for Record Company outside the United States and/or Canada, or sold through record clubs....

With respect to all third party mechanical and synchronization licensing income (other than motion picture and/or commercial synchronization licensing fees, all Artists will be paid by Record Company one-half (50%) of all income computed at the source;)....There may be a deduction from the Artists' share of any such income of one-half of any bona-fide third party agent costs paid by Record Company in connection with securing any particular li-

cense, not to exceed six (6%) percent of the licensing income computed at the source (with a maximum agency commission deduction chargeable against the license fees payable by Record Company to Artists therefore to be six (6%) percent of the total license fees payable at the source).

(Trial Ex. 3 at 5–6)

Plaintiff Hank Ballard previously litigated claims against Defendants Gusto and GML in this district in *Ballard v. Gusto Records, Inc. and GML, Inc.*, 3:89–1019. Before trial, the parties to that action entered into an agreement in January 1993 concerning the settlement of Ballard's claims and the defendants' payments of future obligations to Ballard (the "Ballard Agreement"). (Trial Ex. 4)

With respect to future royalty obligations, the Ballard Agreement provides:

With respect to any revenues collected by the Record Company[4] or its affiliates on or after January 1, 1993 resulting from the exploitation of the Artist's master recordings through product directly manufactured by the Record Company or any entity owned or controlled by Moe Lytle or any of his designees, the Record Company shall pay the Artist royalties at the rate of six and one-half percent of retail suggested list price times ninety percent (90%) of the quantity of product manufactured and distributed for sale by or for the Record Company in the U.S.A. and Canada, and paid for; and one-half (50%) of such amount with respect to ninety percent (90%) of the product manufactured and distributed for sale by or for Record Company outside the United States and/or Canada, and paid for.

With respect to all third party licensing income, including, but not limited to, synchronization licensing income, the Artist shall be paid by the Record Com-

---

**3.** In the Thomas Agreement, the term "Record Company" is defined as Gusto and GML. (Trial Ex. 3 at 1)

**4.** In the Ballard Agreement, the term "Record Company" is defined as Gusto and GML. (Trial Ex. 4 at 1)

pany one-half (50%) of the total of such licensing income. The total license income is to be computed from the source, less only the administrative costs or fees, which costs or fees shall not exceed 20% of the total of such licensing income.

(Trial Ex. 4 at 2–3)

On March 6, 1995, Plaintiffs filed this action against, among others,[5] Gusto, GML, and Lytle, alleging breaches of the Thomas Agreement and the Ballard Agreement. (Docket No. 1)

*Plaintiffs' Master Recordings*

At issue in this case are the royalties allegedly owed for the exploitation by the defendants of certain master recordings. Plaintiff Gene Pitney recorded certain masters at issue in this case for Musicor Records. (Tr. at 54) Plaintiffs B.J. Thomas and The Shirelles recorded certain master recordings at issue in this case for Scepter Records. (Tr. at 123, 336) Plaintiff Ballard recorded certain master recordings at issue in this case for King Records. (Tr. at 444)

The master recordings that Plaintiff Ballard recorded for King Records were purchased from Tennessee Recording and Publishing by Lytle's companies in the 1970s. (Tr. at 447–48) The master recordings that Plaintiffs Thomas and The Shirelles recorded for Scepter Records and the master recordings that Plaintiff Pitney recorded for Musicor Records are part of the Springboard Catalogue. (Tr. at 444) In the early 1980s, the Springboard Catalogue was sold through bankruptcy court to CBS Special Products. Shortly thereafter, CBS Special Products sold the Springboard Catalogue to Jey Production Co., Inc. Jey Production then sold the Spring-

board catalogue to Koala Records, Inc. GML purchased the Springboard Catalogue from Koala Records. (Tr. at 448)

*Exploitation by Stephen Hawkins' Entities*

In order to exploit the Springboard Catalogue and the King Masters, GML entered into license agreements with two companies now owned by Stephen Hawkins, Highland Music, Inc. and Nestshare, Ltd. In its License Agreement with Highland Music, entered into on or about October 28, 1992, GML granted Highland Music the exclusive right to exploit these master recordings in the United States. (Trial Ex. 5; Tr. at 783–84) On or about January 1, 1986, GML entered into a License Agreement with Nestshare[6] for a five-year term, granting Nestshare the exclusive right to exploit the master recordings at issue in this case outside the United States. This license agreement was renewed in 1989, 1992 and in 1995. (Trial Ex. 37)

*Exploitation by Sehorn Defendants*

The Sehorn defendants claimed rights to the Springboard Catalogue under a 1982 agreement with Jey Production. (Trial Ex. 5B) In the agreement, Jey Production conveyed to Mr. Sehorn non-exclusive rights in the plaintiffs' master recordings, not including those of Hank Ballard. (Trial Ex. 5B) On April 1, 1987, Sehorn's company, Red Dog Express, Inc., entered into an agreement with San Juan Music Group, Inc., giving San Juan the non-exclusive right to exploit the Springboard Masters in perpetuity. (Sehorn Dep. (11/10/1999) at 50, Ex. 9) On February 19, 1988, Red Dog Express entered into an agreement with Musicrent, Inc., giving Musicrent the

---

**5.** Plaintiffs have also filed suit against Defendants Marshall E. Sehorn, White Dog, Ltd., and Red Dog Express, Inc (the "Sehorn defendants"). These claims also concern the failure to pay the plaintiffs royalties as a result of their exploitations of the plaintiffs' master recordings. In 1996, the Sehorn defendants filed for bankruptcy and the case against them was automatically stayed under

11 U.S.C. § 362(a)(1). *See* Docket No. 43 at 11.

**6.** When GML entered into this license with Nestshare, Lytle owned all but one share of Nestshare's stock. Mr. Lytle's son owned the remaining share of Nestshare stock. Lytle sold Nestshare to Hawkins in 1993.

non-exclusive right to exploit the Springboard Masters in perpetuity. (Chernow Dep. (12/12/1999), Ex. 8)

On March 29, 1988, GML filed suit against the Sehorn defendants in *GML, Inc. v. Marshall E. Sehorn, et al.*, Case No. 3:88–0287 (M.D.Tenn.) (Nixon, J.), seeking a declaratory judgment that Sehorn had no right to exploit the Springboard Masters and injunctive relief prohibiting the Sehorn defendants and Sehorn's licensees from continuing to exploit the Springboard Masters. On November 29, 1988, Judge Nixon granted GML's motion for a preliminary injunction, enjoining the Sehorn defendants and licensees from continuing to exploit the Springboard Masters. (Trial Ex. 92) After the entry of the preliminary injunction, the Sehorn licensees ceased exploitation of the Springboard Masters. (Chernow Dep. (12/12/1999) at 12–13)

On December 27, 1990, while the injunction was still in effect, GML entered into a Settlement Agreement with the Sehorn defendants in which GML "reserved" its rights to challenge the validity of the Sehorn/Jey Production agreement. (Trial Ex. 1C at ¶ 7) With respect to the Sehorn defendants' ability to exploit the Springboard Masters, the agreement stated:

> However, as to the 'Jey Masters', the parties hereto agree as follows:
>
> a. Sehorn may continue to exploit the 'Jey Masters' in accordance with the provisions ... of this Agreement until midnight December 31, 2000 ('the Term') at which time Sehorn will surrender to GML all right, title and interest in and to the 'Jey Masters' whether said right, title or interest be by ownership, license, assignment, pledge, hypothecation or any other right or claim relative to either ownership or commercial exploitation.

> b. Sehorn will continue to license said 'Jey Masters' to licensees....

(Trial Ex. 1C at 4–5)

Since the execution of the 1990 Settlement Agreement, the Sehorn defendants and licensees have exploited the Springboard Catalogue without paying royalties to the plaintiffs in this case. (Sehorn Dep. (11/10/99) at 73–74)

*Sale of the Plaintiffs' Master Recordings*

In November 1997, Gusto wrote a letter to the plaintiffs in this action, informing them of its intent to sell their master recordings.[7] On December 4, 1997, Gusto entered into a Sale Agreement and a Security Agreement with Catalogue Music, Ltd, a limited liability company in England owned by Hawkins. (Trial Ex. 24, Exs. A, B; Tr. at 847) The sale of the plaintiffs' master recordings to Catalogue Music was effective January 1, 1998.

## CONCLUSIONS OF LAW

Plaintiffs claim that the Lytle defendants[8] have failed to account to them fully for exploitations of their master recordings as required by the Thomas and Ballard Agreements. Specifically, Plaintiffs claim that they are owed royalty payments for foreign exploitations of their master recordings for the period January 1, 1992 through December 31, 1999 and for certain domestic exploitations.

### A. *Thomas and Ballard Agreements*

Under the choice of law provisions in the agreements, the breach of contract claim under the Thomas Agreement is to be governed by New York law and the breach of contract claim under the Ballard Agreement is to be governed by Tennessee law. *See* Trial Ex. 3 at § 7; Trial Ex. 4 at § 7.

■ Under New York law, in order to establish a breach of contract, a plaintiff must prove "(1) the existence of an agree-

---

7. During the pendency of this litigation, the Springboard masters were transferred from GML to Gusto. (Tr. at 444)

8. The designation "Lytle defendants" refers to Defendants Gayron M. Lytle, Gusto Records, Inc. and GML Inc.

ment; (2) due performance of the contract by the party alleging the breach; (3) a breach; and (4) damages resulting from the breach." *Lehmann v. Lehmann*, 182 Misc.2d 22, 696 N.Y.S.2d 663 (Civ.Ct.1999). *See also Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522 (2d Cir.1994). The standard under Tennessee law is similar. *See Custom Built Homes v. G.S. Hinsen Co., Inc.*, 1998 WL 960287 (Tenn.Ct.App. Feb.6, 1998). *See also Life Care Centers of America, Inc. v. Charles Town Associates Ltd. Partnership, LPIMC, Inc.*, 79 F.3d 496, 514 (6th Cir.1996) ("[T]he basic elements of a breach of contract case under Tennessee law must include (1) the existence of a contract; (2) breach of the contract, and (3) damages which flow from the breach. The plaintiff's performance under the contract is not an element of his claim, but rather an affirmative defense.").

There is no dispute that the Thomas and the Ballard Agreements are valid contracts governing this action. There is no evidence that the plaintiffs have not fully performed under these agreements. There is ample proof that the Lytle defendants have breached these agreements. As discussed below, the Lytle defendants have not paid the plaintiffs for any royalties owed as a result of the exploitation by the Sehorn defendants; they have underpaid the plaintiffs for royalties owed as a result of the exploitation by Nestshare and Highland; and they have not accounted to the plaintiffs for any royalties owed for the years 1998–1999.

■ In order to recover damages for the amount of royalties owed, the plaintiffs must establish, under New York law, "a stable foundation for a reasonable estimate of royalties" and there is no requirement for "theoretical perfection." *B.J. Thomas v. Gusto Records, Inc.*, 939 F.2d 395, 401 (6th Cir.1991) (quoting *Contemporary Mission, Inc. v. Famous Music Corp.*, 557 F.2d 918, 926, 928 (2d Cir.1977)). Similarly, under Tennessee law, the plaintiffs can recover damages where there is "proof of damages within a reasonable degree of certainty." *Redbud Cooperative Corp. v. Clayton*, 700 S.W.2d 551, 561 (Tenn.Ct. App.1985). *See also Pinson & Associates Ins. Agency, Inc. v. Kreal*, 800 S.W.2d 486, 488 (Tenn.Ct.App.1990) ("[M]ere uncertainty as to the amount will not prevent recovery if the evidence is of such certainty as the nature of the case permits and such as to lay a foundation enabling the trier of fact to make a fair and reasonable assessment of damages." (internal quotations omitted)).

■ The court looks to the Thomas and Ballard Agreements to provide the framework in which to evaluate the damages to plaintiffs as a result of the Lytle defendants' breaches of these agreements. The parties dispute the meaning of the language in the agreements that specifies the point at which the plaintiffs' share of any third-party licensing income is to be calculated. Specifically, the parties disagree as to the meaning of the phrase "at the source" as it is found in the Thomas Agreement and "from the source" as it is found in the Ballard Agreement. *See* Trial Ex. 3 at 5(a), Trial Ex. 4 at § 4(a).

In the Thomas Agreement, the provision regarding the calculation of royalties for third-party licensing income reads:

> With respect to all third party mechanical and synchronization licensing income (other than motion picture and/or commercial synchronization licensing fees), all Artists will be paid by Record Company one-half (50%) of all income computed *at the source;* .... There may be a deduction from the Artists' share of any such income of one-half of any bonafide third party agent costs paid by Record Company in connection with securing any particular license, not to exceed six (6%) percent of the licensing income computed at the source (with a maximum agency commission deduction chargeable against the license fees payable by Record Company to Artists therefore to be six (6%) percent of the total license fees payable at the source).

(Trial Ex. 3 at § 5(a) (emphasis added)) In the Ballard Agreement, the equivalent provision reads:

> With respect to all third party licensing income, including, but not limited to, synchronization licensing income, the Artist shall be paid by the Record Company one-half (50%) of the total of such licensing income. The total license income is to be computed *from the source*, less only the administrative costs or fees, which costs or fees shall not exceed 20% of the total of such licensing income.

(Trial Ex. 4 at 4(a) (emphasis added))

The plaintiffs argue that the royalties due from third-party licensing income should be calculated based on the income received by the ultimate sublicensee. Thus, for example, where GML and Gusto have licensed the plaintiffs' master recordings to Nestshare, the plaintiffs argue that their royalties should be calculated based on the income received by Nestshare from its licensees.[9] The Thomas Agreement provides that the plaintiffs are to receive 50% of all income "at the source". The plaintiffs who claim under the Thomas Agreement contend that they are entitled to 44% of what Nestshare receives from its licensees because of the 6% deduction allowed under the agreement. Plaintiffs under the Ballard Agreement would be entitled to 50% of the licensing income received by Nestshare from its licensees, less the allowed deduction not to exceed 20%.[10]

The Lytle defendants contend that the "at the source" and "from the source" language in the Thomas and Ballard Agreements is to be interpreted differently. They argue that the royalties for third-party licensing are to be calculated based on the money GML and Gusto receive from their licensees.[11] Thus, GML and Gusto are the "source." The defendants also argue that, under the provisions of the GML/Nestshare license agreement, Nestshare is allowed to deduct 40% from any income received from Nestshare's licensee for expenses [12] before it pays any money to GML or Gusto.

9. It appears that the plaintiffs may have changed their position on this issue during the course of the trial. In their Proposed Findings of Fact and Conclusions of Law, it is stated: "Plaintiffs have demonstrated that, as a matter of law, plaintiffs' royalties should be calculated 'at the source.' For example, if a third party licensee (such as Castle) obtains a license from a licensee of defendant (such as Nestshare), plaintiffs are entitled to fifty percent (50%) of the income received by Nestshare." (Docket No. 241 at ¶ 89) During closing argument, Plaintiffs' counsel seemed to argue that the plaintiffs were entitled to the money that was received by the last sublicensee, or the licensee "who sells that products to the folks who sell it to the person who uses and listens to the music." (1/25/2000 Tr. at 22)

10. Although the Ballard Agreement clearly states that there can be a deduction not to exceed 20% from any third-party licensing income, the parties apparently are in agreement that the 20% expense cost is to be divided equally between GML and Ballard, so that only 10% is deducted before payment is made to Ballard. (2/7/2000 Tr. at 72)

11. After the bench trial, the Lytle defendants submitted as supplemental authority an opinion issued by Senior United States District Judge Thomas Wiseman in *Orbison v. Sony Music Entertainment*, 3:97–0903 (Wiseman, J.). While Judge Wiseman determined that royalties were to be calculated based on the money actually received by the defendant, Sony Music, the language at issue in that case was very different from that in this case. There, the contract stated that Orbison was entitled to receive royalty payments "equal to one-half of the net amount actually received by us...." (Docket No. 272, Ex. 1 at 2) There is no such language here.

12. The December 6, 1995 Nestshare license states that "[w]ith respect to third-party sublicensing[,] Licensee is considered to be the source of the royalties to Licensor and as a reflection of the higher costs involved in foreign licensing[,] Licensee shall be allowed to deduct its expenses relating to the Masters from the royalties received from third parties, such deduction not to exceed 40 per centum (40%) of the amount received by Licensee." (Trial Ex. 37, § 3.2 at 5) This provision first appeared in the February 16, 1993 Agreement between GML and Nestshare that amended the November 12, 1992 Agreement between these entities. (Trial Ex. 37, Tab 2)

■ The court finds the defendants' interpretation of "at the source" and "from the source" to be unsupported. First, under principles of contract law, all language in a contract is to be given effect. *See Coppola v. Stroker*, 235 A.D.2d 536, 537, 653 N.Y.S.2d 134 (App.Div.1997) ("Other principles of contract construction require that plain language should be given effect ... and that every provision should be deemed to have some meaning...."); *Fox Paper Ltd. v. Schwarzman*, 168 A.D.2d 604, 605, 563 N.Y.S.2d 439 (N.Y.App.Div. 1990) (same); *Wilson v. Moore*, 929 S.W.2d 367, 373 (Tenn.Ct.App.1996) ("Contractual terms should be given their ordinary meaning ..., and should be construed harmoniously to give effect to all provisions and to avoid creating internal conflicts."); *Musto v. American General Corp.*, 861 F.2d 897, 906 (6th Cir.1988) (same).

Under the defendants' interpretation of the disputed language, there would be no need for the terms "at the source" and "from the source" to appear in the agreements at all. The defendants argue that the plaintiffs are only entitled to royalties based on the income received by GML and Gusto, but, if that were the case, the agreements would have simply said that. Instead, the Thomas Agreement provides, "all Artists will be paid by Record Company [13] one-half (50%) of all income computed at the source...." (Trial Ex. 3 at § 4(a)) And the Ballard Agreement states, "Artist shall be paid by the Record Company one-half (50%) of the total of such [third party licensing] income ... computed from the source...." (Trial Ex. 4 at § 5(a)) There would be no need for the "at the source"

and "from the source" language if plaintiffs' royalties are based upon the income received by the Record Company. These provisions would simply have been worded "50% of the licensing income received by Record Company", as was the wording in *Orbison v. Sony. See supra*, at fn. 9. Neither New York nor Tennessee law allows this court to find the contested wording superfluous, which it would be under the defendants' interpretation.

In addition, the plaintiffs' royalties for domestic exploitations were calculated on the basis of the amounts received by Highland (GML's licensee), rather than by GML. During trial, Hawkins testified that, prior to June or possibly December 1996, he prepared the royalty accounting statements for the domestic exploitations of the plaintiffs' master recordings based on the amount of money received by GML from Highland.[14] (Tr. at 789) In the example given by Hawkins, where the sublicensee paid $100 to Highland, Highland would deduct its fee of 15% [15] and then Hawkins would calculate the royalties owed to the plaintiffs based on the $85 to be received by GML. Thus, in this hypothetical, the plaintiffs would receive 44% of $85, or $37.40.[16] (Tr. at 794–95) However, in either June or December 1996, Mr. Lytle asked Hawkins to recalculate the royalties owed to the plaintiffs for domestic exploitations of their master recordings based on Highland's gross receipts, rather than on the money received by GML. (Tr. at 799) This recalculation of domestic royalties is in keeping with the more persuasive interpretation of the terms "at the source" and "from the source" in the Thomas and Ballard Agreements.

13. In both agreements, GML and Gusto are referred to as "the Record Company."

14. At Lytle's request and without compensation, Hawkins was "happy to oblige" by preparing the royalty accounting statements sent to the plaintiffs since the late 1980s or early 1990s. (Tr. at 788–89)

15. The October 28, 1992 agreement between GML and Highland Music states, "[w]ith re-

spect to any royalties derived from third party licensing of the Masters Highland shall pay to G.M.L. 85% of such royalty income." (Trial Ex. 5 at § 4(a))

16. Although the Ballard Agreement provides for a deduction of up to 20% for costs and fees, Hawkins testified that 12% was always applied, with 6% deducted for GML and 6% attributable to the plaintiffs. (Tr. at 795–96)

Because the plaintiffs' royalties are to be calculated based on the income received by Highland and Nestshare, GML's and Gusto's respective exclusive licensees, the court need not reach the question of whether Nestshare is entitled to deduct 40% from the income it receives from its licensee for expenses before it remits to Gusto. The amount of the plaintiffs' royalties is to be calculated based on the income received by Nestshare, and the plaintiffs are not affected by any deduction taken by Nestshare for its expenses before it remits to Gusto. Furthermore, there was no evidence in the record that the plaintiffs agreed to any deductions beyond those specifically identified in the Thomas and Ballard Agreements, and the defendants cannot dilute the plaintiffs' royalties in this manner. Thus, the court finds that the plaintiffs are entitled to the calculation of royalties for foreign exploitations of plaintiffs' master recordings based on the income received by Nestshare from its licensees.

### B. *Domestic Exploitation of Plaintiffs' Master Recordings*

During closing arguments, Plaintiffs' counsel made a specific request for domestic royalties for a product entitled, "20 Greatest Hits of B.J. Thomas."[17] (1/25/2000 Tr. at 149)

During the trial, the Lytle defendants offered into evidence a SoundScan report[18] of sales of specific albums of B.J. Thomas dated December 29, 1999. (Trial Ex. 11a) The sales for the recordings listed on that exhibit ranged from 0 units to 238,469 units sold. Hawkins testified that "20 Greatest Hits of B.J. Thomas," which,

according to the SoundScan report, had sold 238,469 units since its release date of March 25, 1991, was a Highland product. (Tr. at 970)

Counsel for the plaintiffs asserted that B.J. Thomas had never been paid royalties for that product.[19] During closing argument, plaintiffs' counsel stated, "I can vouch to the Court that I looked through the accountings and did not see any accounting for the 238,469 pieces of product that allegedly SoundScan says was sold." (1/25/2000 Tr. at 148) Counsel continued, "If that product sold, Your Honor, on a normal basis, for anywhere from [$]8 to all the way to $6, using the formula that is in the settlement agreements with respect to product sold or manufactured, we would be entitled to anywhere from $64,386 to $85,848." (1/25/2000 Tr. at 149)

In response, counsel for the defendants argued that B.J. Thomas may have been paid the royalties for this product by Highland, and counsel directed the court to Exhibit 51. Exhibit 51 shows domestic artist royalties paid to B.J. Thomas, broken down by master recording and income source. There is no entry for "20 Greatest Hits of B.J. Thomas." However, where the income source is Highland, the master recording is listed simply as "Various." If the Lytle defendants did account to B.J. Thomas for this product, it would have to have been included under this "Various" category. However, the total amount of royalties paid to B.J. Thomas for all exploitations of his masters by Highland from January 1, 1992 through December 31, 1997 is under $3,000.00.[20] Thus, even if the Lytle defendants have been accounting

---

17. There was no explicit proof that this was a compact disc, but it probably was.

18. B.J. Thomas testified that SoundScan provides reports of retail sales of musical recordings in the United States. (Tr. at 365) Mr. White clarified that the SoundScan reports do not provide a complete accounting of all retail sales in the United States because it is limited to those units sold that are scanned by bar code. (Tr. at 634–45)

19. Unfortunately, B.J. Thomas never testified to this fact because he was not asked the question.

20. There was no backup provided in Exhibit 51 for the royalties paid to B.J. Thomas for the six months ending June 30, 1992 in the amount of $2,730.72.

to B.J. Thomas for the product "20 Greatest Hits of B.J. Thomas," they have underpaid B.J. Thomas significantly.

There is no evidence in the record as to the price for the plaintiffs' product in the United States. In order to recover damages under New York law, the plaintiff must establish "a stable foundation for a reasonable estimate of royalties." *B.J. Thomas v. Gusto Records, Inc.*, 939 F.2d 395, 401 (6th Cir.1991) (quoting *Contemporary Mission, Inc. v. Famous Music Corp.*, 557 F.2d 918, 926, 928 (2d Cir. 1977)). Based on the representation by plaintiffs' counsel, in the light of common experience, the court finds that $8 is a reasonable estimated price for "20 Greatest Hits of B.J. Thomas." Under the Thomas Agreement, the Lytle defendants are obligated to pay B.J. Thomas "five percent of ninety percent of retail suggested list price times quantity sold" for domestic exploitation. *See* Trial Ex. 3 at § 5(a). Under the terms of the Thomas Agreement, the court finds B.J. Thomas is entitled to royalties in the amount of $85,848 for the exploitation of this product.

### C. *Foreign Exploitation of Plaintiffs' Master Recordings*

■ Plaintiffs contend that the Lytle defendants are liable to them for the Sehorn defendants' exploitations of the plaintiffs' master recordings because, in 1990, the Lytle defendants, in settling the lawsuit they filed against Sehorn,[21] granted a license to Sehorn to exploit the Springboard masters.

The Lytle defendants have argued that they are not liable for any of the exploitation by the Sehorn defendants and the Sehorn licensees because (1) Sehorn's rights derive from the 1982 Sehorn/Jey Production Agreement and, as such, Sehorn acquired his rights before the Lytle defendants acquired the Springboard Catalogue; (2) Plaintiffs resolved their claim against the Sehorn defendants in the Sehorn bankruptcy action;[22] (3) the 1990 Settlement Agreement did not contain a grant of rights to Sehorn; (4) even if the court finds that a grant of rights was contained in the 1990 Settlement Agreement, there can be no liability for the license agreements between the Sehorn defendants and the Sehorn licensees which pre-date the Settlement Agreement; and, (5) to the extent that the court finds that the Lytle defendants are liable for the exploitation by the Sehorn defendants and licensees, the Lytle defendants have only received $150,000 from the Sehorn defendants and, as such, the plaintiffs can only be entitled to a portion of this amount.

In the 1990 Settlement Agreement between the Sehorn defendants and GML, the Sehorn defendants agreed to pay GML $150,000 "to help defray the legal expenses and related costs of GML relative to this

**21.** *GML, Inc. v. Marshall E. Sehorn, et al.*, Case No. 3:88–0287 (M.D.Tenn.) (Nixon, J.) was filed in this court on March 29, 1988. Judge Nixon enjoined Sehorn's exploitation of the Springboard masters until the case was settled on December 27, 1990 with the execution of a settlement agreement ("1990 Settlement Agreement").

**22.** The court rejects this argument. As the evidence demonstrated at trial, in the Sehorn bankruptcy case in the United States Bankruptcy Court for the Eastern District of Louisiana, Case No. 96–10278, there was an Agreed Order entered into between the Sehorn defendants as the debtors and the plaintiffs as the claimants. (Trial Ex. 87) In that Agreed Order, the parties agreed that the "Claimants shall have a single allowed claim in the amount of $75,000.00 against the consolidated debtors." (Trial Ex. 87 at 1–2) However, in settling their claim, the parties agreed that "[t]his Agreed Order shall have no res judicata, collateral estoppel or preclusive effect except between the parties to this Agreed Order. This Agreed Order shall neither discharge, nor be evidence of the merits or amounts of, any claims or causes [of] action against any person or entity not party to this Agreed Order." (Trial Ex. 87 at 2) The Lytle defendants did not establish that the resolution of the plaintiffs' claims against the Sehorn defendants in the Sehorn bankruptcy case should judicially estop the plaintiffs from asserting their claims against the Lytle defendants in this case.

litigation." (Trial Ex. 1C at 2) The Sehorn defendants further agreed to give GML a non-exclusive license to exploit the Chess/Checker, the Carr/Schulman, and the Sehorn Catalogues for a fifteen-year period. (Trial Ex. 1C at 2–3) In exchange, GML, while "reserv[ing] its position on the invalidity" of the Sehorn/Jey Production Agreement, agreed that:

> However, as to the 'Jey Masters', the parties hereto agree as follows:
>
> a. Sehorn may continue to exploit the 'Jey Masters' in accordance with the provisions ... of this Agreement until midnight December 31, 2000 ('the Term') at which time Sehorn will surrender to GML all right, title and interest in and to the 'Jey Masters' whether said right, title or interest be by ownership, license, assignment, pledge, hypothecation or any other right or claim relative to either ownership or commercial exploitation.
>
> b. Sehorn will continue to license said 'Jey Masters' to licensees....
>
> g. Sehorn or Sehorn's licensees will not pay royalties or payments of any nature to GML for exploitation of the 'Jey Masters.' Sehorn acknowledges GML's claim to the 'Jey Masters' and agrees that GML may exploit said 'Jey Masters' in any and all ways consistent with ownership.

(Trial Ex. 1C at 4–5) In 1995, Lytle submitted a declaration in a case pending in the Los Angeles Superior Court in California, *MCA Records, Inc. v. Baur Music Productions,* Case No. BC 068 119.[23] (Trial Ex. 31) GML, a defendant in that case, filed a cross-complaint in that case against the Sehorn defendants, and Lytle's declaration was submitted in support of a Motion for Summary Adjudication of Issues. In that declaration, executed on July 17, 1995 while this case was pending in this court, Lytle, on behalf of GML, stated:

> 6. As part of the settlement with Sehorn ... [,] GML, while reserving its position on the invalidity of the Jey/Sehorn Agreement, allowed Sehorn to resume exploitation of the Jey Masters, subject to the terms specified.
>
> 7. *The rights granted to Sehorn* to exploit the Jey Masters are very valuable and, in turn, lower the value of the Springboard Catalog to GML. GML only agreed to *grant the rights in the Jey Masters* because GML believed that it was receiving in return valuable rights in two catalogs of master recordings known as the Chess/Checker Catalog and the Carr/Shulman Catalog, of which the Carr/Shulman Catalog was the most valuable to GML.

(Trial Ex. 31 at ¶¶ 6–7 (emphasis added))

The language in the 1990 Settlement Agreement and in the 1995 Lytle Declaration in the California proceeding go a long way toward establishing that the 1990 Settlement Agreement granted a license to the Sehorn defendants to exploit the Springboard masters involved in this case. But the additional evidence that the Sehorn licensees did not exploit the plaintiffs' master recordings from the time of the entry of the preliminary injunction until the injunction was lifted pursuant to the settlement of the case makes that conclusion a firm one.

During his deposition, Michael Chernow, the president of two of Sehorn's licensees, San Juan Music Group, Ltd. and Musicrent, Inc., testified that, after Judge Nixon issued the preliminary injunction, he understood that "Marshall Sehorn was enjoined from exploiting the Springboard Master's (sic) pursuant to this injunction" and, as a result, he and his companies stopped licensing the plaintiffs' master recordings. (Docket No. 253, Chernow Dep. (12/12/1999) at 12) Chernow and his companies ceased licensing the plaintiffs' masters until Sehorn "called us and told us the

---

23. In that case, MCA Records claimed that neither the Sehorn defendants nor the Lytle defendants had any rights to the Chess/Check-

er Catalogue. (Docket No. 253, Sehorn Dep. at 52, ll. 9–14, 21–25)

injunction was lifted." (Docket No. 253, Chernow Dep. (12/12/1999) at 13) Although Sehorn never referred to the 1990 Settlement Agreement in connection with any discussion of Chernow's right to resume his exploitation of the plaintiffs' master recordings, Sehorn did refer to a settlement. (Docket No. 253, Chernow Dep. (12/12/1999) at 17) Thus, it appears that only the grant of rights from GML to the Sehorn defendants in the 1990 Settlement Agreement [24] allowed the exploitation of the plaintiffs' master recordings by the Sehorn licensees to continue. Thus, the Lytle defendants are responsible for all royalties accrued as a result of the 1990 Settlement Agreement [25] that should have been paid under the Thomas Agreement.

■ The Lytle defendants make two arguments about damages due the plaintiffs if this court finds them responsible for royalties owed as a result of the exploitation of their master recordings by the Sehorn defendants. First, they contend that no damages are due because they have not received any income from the Sehorn defendants, other than $150,000 as part of the 1990 Settlement Agreement. Since the $150,000 was paid specifically "to help defray the legal expenses and related costs of GML" (*see* Trial Ex. 1C), this money cannot be considered income as contem-

plated in the Thomas Agreement. Second, if the court does consider the $150,000 payment by the Sehorn defendants to be income, the plaintiffs are only entitled to $75,000 or 50% of the money under the Thomas Agreement.

The court agrees with the Lytle defendants that the plaintiffs are not entitled to any portion of the $150,000 received by the Lytle defendants for legal expenses. However, as discussed above, the calculation of royalties for foreign exploitations of plaintiffs' master recordings is based on the income received by the Lytle defendants' licensees, here the Sehorn defendants. *See supra* at 913–15. Thus, regardless of the fact that the Lytle defendants allege to have received no income from the Sehorn defendants, they owe the plaintiffs royalties for these exploitations based upon what the Sehorn defendants received.

### D. *Plaintiffs' Expert Witnesses*

■ Two expert witnesses, Mr. Steven White and Mr. Tony Hughes, testified for the plaintiffs in support of the plaintiffs' claim for royalties under the Ballard and Thomas Agreements. Mr. White was qualified as an expert generally in the music and entertainment field and specifically in the music accounting and royalty accounting fields. (Tr. at 374, 377) He provided schedules [26] of the amounts alleg-

24. In finding that the 1990 Settlement Agreement constitutes a license, this court does not find that Sehorn acquired his rights to the Springboard Catalogue as a result of the 1982 Jey/Sehorn Agreement. No court has ruled, and this court need not rule, on the issue of the validity of the 1982 Jey/Sehorn Agreement.

25. The 1990 Settlement Agreement had no provision for the payment of artist royalties to the plaintiffs. The Thomas Agreement requires Gusto and GML to pay artists' royalties for exploitation of the plaintiffs' master recordings. *See* Trial Ex. 3 at 5–6. It should come as no surprise to the Lytle defendants, who entered into the Thomas Agreement two years after signing the 1990 Settlement Agreement with Sehorn, that they are the entity responsible for the payment of all royalties due the plaintiffs for the Sehorn defendants' exploitations.

26. Mr. White's credibility was somewhat diminished by the fact that Charles Rubin, the president of Artist Rights Enforcement Corp. ("AREC"), gave him the original draft schedules from which to work (Tr. at 381; Rubin Dep. (11/4/1999) at 283–84) and advised him of corrections that should be made to his schedules. *See* Trial Exs. 5T, 5V. *See also* Tr. at 432–33, 582, 585, 594. According to Mr. White, the draft schedules provided all the information contained on the final version of his expert schedules, except licensee price category, base price, unit rate, and total income. (Tr. at 427–28) AREC works on behalf of musicians to recover unpaid royalties and has an agreement with each of the plaintiffs that it will receive 50% of all monies recovered. (Tr. at 62–63, 132–33, 324, 340–41)

edly owed to the plaintiffs by the Lytle defendants for unpaid royalties.[27] (Trial Ex. 64) Mr. Hughes was allowed to testify in corroboration of the schedules about licensing royalty rates and the pricing and probable numbers manufactured of the plaintiffs' product in Europe. (Tr. at 196–97, 202–03) For the reasons that follow, the court finds that the estimates provided in the schedules with respect to the date of release, the base price of the product, the number of units sold of each product, and the total royalty income due for each product are not reliable.[28]

### 1. Date of Release

In the schedules compiled by Mr. White, there is a date of release for each product. The plaintiffs are only seeking damages for the eight-year period from January 1, 1992 through December 31, 1999. The date of release of the plaintiffs' product presumably is provided to determine the number of years for which the defendants may owe royalties. However, Mr. White testified that he estimated the sales for each product for the entire eight-year period, regardless of actual release date.

27. There is a schedule for each artist. Each schedule is broken down by product, with columns headed: date of release, licensor, licensee, product source, product title, price category, base price, number of masters included on the product, number of masters of plaintiffs on the product, royalty rate, unit rate, number of units sold, and total royalty income. (Trial Ex. 64) As indicated in Mr. White's report, "product source" refers to the source of the information for the listed product, including license agreements, actual product, royalty accounting statements, product compiled by the plaintiffs' witness, Howard Matthews, and listings on the Internet. (Trial Ex. 64, Legend; Tr. at 597)

28. Defendants filed a Motion (Docket No. 281) following the trial in this case, stating that they had "discovered evidence which affects not only the outcome in the case, but also further emphasizes the unreliability of the testimony of Plaintiffs' experts and evidences the Plaintiffs' own failure to have disclosed material evidence in their testimony and presentation." (Docket No. 281 at 1) Defendants claim that recently acquired documents demonstrate that Gene Pitney and The

Thus, even where a product was released in 1998 or 1999, he still estimated the sales for a eight-year period. *See* Tr. at 601, 603, 611.

In addition, throughout the report, there are instances where the date of release is not provided and an "n/a" (not available) notation appears. For example, on the original schedule of Gene Pitney product, approximately 50% of the Gene Pitney product has an "n/a" in the date of release column. (Trial Ex. 64) The plaintiffs did not provide the court with any means by which to determine when these products were actually released, and there was little evidence introduced to resolve this issue.[29]

In light of the lack of evidence put forth by the plaintiffs, the court has no basis upon which to determine the appropriate calculation of royalties for the product designated by "n/a." Accordingly, the court eliminates all entries on the schedules that are designated by the "n/a" date of release. The plaintiffs have failed to establish their damages for these products with a reasonable degree of certainty.

Shirelles have received $59,000 in artist royalties from Sony Music for two products, "Gene Pitney: Anthology" (1961–1968) and "Shirelles: Anthology" which are listed on the plaintiffs' expert schedules and for which the plaintiffs claim the defendants are responsible. The court has reviewed the documents submitted by the defendants and finds that they do not support the defendants' position. First, the documents do not identify the product for which the plaintiffs were allegedly paid royalties. Although Sony Music royalty statements are referenced in Exhibit D, the defendants have failed to provide these statements. On the basis of the evidence presented, the court finds that the defendants' submittal does not alter the evidence already presented in this case. This motion will be denied by separate order.

29. There was testimony that approximately 10–12 new pure Gene Pitney products are released per year. (Tr. at 119) There was no testimony as to the number of products released annually that contain the recordings of the other plaintiffs, nor how many new products come on the market each year that contain at least one of their recordings.

## 2. *Base Price*

The schedules provide a base price for each product listed. In his expert report, Mr. White stated that "[t]he standard practice in the industry for calculating royalties varies, but is usually either the suggest[ed] retail price, the wholesale selling price, or the published price to dealers (the "PPD") often used in Europe." (Trial Ex. 64 at 3) Defense expert Thomas Bonetti basically agreed with this testimony. (Tr. at 721)

In his expert report, Mr. White calculated the foreign royalties due to the plaintiffs based on the PPD. (Trial Ex. 64 at 3) Where the PPD was not available for a particular product, Mr. White estimated the figure.[30]

The court found the testimony of Mr. Howard Matthews, a retired English police officer and long-time Pitney fan (Tr. at 88–89), to be the most credible on this issue. Mr. Matthews has purchased Pitney product from all over Europe and many other places in the world. (Tr. at 97) He testified that budget-priced compact discs cost approximately three to five pounds at retail; mid-priced compact discs sell for between five and nine pounds; and premium-priced compact discs retail upwards of 10 pounds. (Tr. at 115–118) Defense expert Bonetti[31] testified that he had no basis for disputing this testimony. (Tr. at 749)

Taking judicial notice of the conversion rate from British pounds to United States dollars,[32] this court finds that a budget-priced compact disc retails for approximately $6, a mid-priced compact disc for approximately $11, and a premium-priced compact disc for approximately $16.

## 3. *Number of Units Sold*

In the schedules, there is an estimated number of units sold outside the United States and Canada for each product. The sales of the plaintiffs' master recordings are estimated at three different levels: 15,000, 35,000 and 50,000.[33]

The court finds that the plaintiffs' estimates of the number of units sold are unreliable. Mr. Hughes testified that Mr. White provided to him a list of record companies with an estimated number of

---

**30.** In calculating the figure, Mr. White stated that in order to account for the mixture of compact discs and cassette tapes in the marketplace during the relevant time period, he assumed that approximately 40% of sales were of cassette tapes and that cassette tapes sold at approximately 75% of the price of compact discs. Thus, the base price was adjusted by 10% (40% of the 25% price difference). *See* Trial Ex. 64, September 30, 1999 Letter from Steven White to Ira Greenberg, Esq., at 4; Tr. at 401–02. The court will accept the base price adjustment.

**31.** Mr. Bonetti was qualified as an expert in the field of foreign licensing and sales. (Tr. at 774) Mr. Bonetti acknowledged during cross-examination that he had worked as an agent for GML and Gusto in the late 1980s. After Mr. Hawkins' companies became the exclusive agent for GML and Gusto, Mr. Bonetti became, and he continues to be, a non-exclusive agent for Mr. Hawkins and his companies. He currently receives income from Mr. Hawkins and his companies as a result of the relationship between his company, Celebrity Licensing, and Mr. Hawkins and his companies. (Tr. at 728–29)

**32.** The average conversion rate for British pounds to United States dollars for the relevant years is as follows: 1992 (0.5664); 1993 (0.6658); 1994 (0.6529); 1995 (0.6335); 1996 (0.6403); 1997 (0.6106); 1998 (0.6037); and 1999 (0.6184). For the years 1992–1998, the conversion rates are taken from the Central Intelligence Agency's *The World Factbook 1995*. The 1999 conversion rate was retrieved from *www.oanda.com*. For the years 1992 through 1999, the average conversion rate was 0.6240.

**33.** In his expert witness statement, Mr. White states that he estimated sales "by reference to a ranking system associated with our understanding of the licensee's position in the marketplace." Thus, for a "Top Level" company, the sales were estimated at 50,000 units, for a "Mid Level" company, 35,000 units, and for an "Unknown" company, 15,000 units. (Trial Ex. 64 at 5) He also testified that he discussed these sales levels with Mr. Hughes and Mr. Rubin. (Tr. at 631)

units sold and an estimated sales price, and that he was asked "to give an opinion as to whether the sales units of that schedule were reasonable." [34] (Tr. at 174) Although he testified that there were a number of record companies with which he was not familiar, he still estimated that these companies would sell 15,000 units "[b]ecause it's a reasonable minimum quantity for a record company to sell." (Tr. at 176) According to Mr. Hughes, it would not make fiscal sense for a record company to make fewer than 15,000 units of a particular product. (Tr. at 187, 189)

On the subject of the estimated number of sales, Mr. Hughes stated that

> based on my experience with record companies of a wide variety of characteristics, any record company putting out such product would sell on average at least 15,000 units of such product in Europe. In making this statement, I'm not saying that every item of product will sell 15,000 pieces. There are some instances in which less is sold. I'll say two other things. First, the costs of selecting works to put out mastering, preparing artwork, manufacturing, mechanical royalty, and distributing product is such that record companies need to sell at least 15,000 units on average to make putting out such product financially worthwhile. And, second, that on average, a record company will achieve minimum sales of product of this genre at about this level.

(Tr. at 209) The court finds Mr. Hughes' opinion to be unsupported by the record.

Depositions were taken of representatives from four foreign licensees of Nestshare, Ace Records, Castle Communications, Reader's Digest, and See for Miles, Ltd. Although the plaintiffs argue that the court should give little weight to this evidence because these witnesses were hand-picked by the defendants and voluntarily testified after they were asked to by Stephen Hawkins, the court finds the testimony of these witnesses to be credible.[35]

Ms. Elaine Diane Booker testified on behalf of Reader's Digest and is the general manager for music operations. (Booker Dep. at 1) Reader's Digest has a license with Nestshare for the exploitation of the plaintiffs' master recordings outside the United States. (Booker Dep. at 5) Mr. White's schedules estimate that 50,000 units of a Gene Pitney product entitled "The Very Best of Gene Pitney" have been sold. (Trial Ex. 64, Schedule 1, at 20) However, Reader's Digest's documentation reflects that, from January 1, 1998 (when the product was released) to June 30, 1998, 303 cassette tapes and 615 compact discs were sold. A comparable number of units were sold for the first six months of 1999: 350 cassette tapes and 534 compact discs. (Booker Dep., Ex. 3) Thus, estimated sales of 50,000 units is wildly inflated.

The disparity between Mr. White's estimated sales and actual sales is also evidenced by the testimony of Mr. Churchill, the representative for Ace Records, and the documents introduced at his deposition. Mr. White estimates that each of the sixteen Ace Records products containing the master recordings of The Shirelles sold 35,000 units. (Again, he did not take into account the actual release date of these products.) However, Mr. Churchill testified that none of these products sold more than 6,500 units during the period from their release date through June 1999. Of the six products specifically discussed during Mr. Churchill's deposition, none sold more than 6,500 units and four sold fewer

---

34. He acknowledged during the *Daubert* hearing that he had never given an expert opinion using the methodology he used in this case and he knows of no other person in his field that has made estimates in this manner. (Tr. at 181–82)

35. While it is possible that the Lytle defendants may have chosen these particular deponents based on the grave disparities between the plaintiffs' experts' estimated sales and the deponents' actual sales, the plaintiffs put forth no countervailing evidence.

than 5,000 units.[36] *See* Churchill Dep., Ex. 3. *See also* Tr. at 222–23.

Mark Rye, a representative of See for Miles Limited, testified by deposition that See for Miles had only one Gene Pitney product in the marketplace during the period 1992–1999. (Rye Dep. at 13)[37] He testified that this product had sold approximately 3,500 units. (Rye Dep. at 15) Mr. White's schedules estimated that "Gene Pitney—The E.P. Collection" had sold 35,-000 units. *See* Trial Ex. 64, Ex. 1, Schedule 1 at 21. This is a ten-fold disparity between the actual sales recorded by See for Miles and the estimated sales by Mr. White, and the plaintiffs put forth no evidence that convinces this court that their estimates are more reliable.[38]

Finally, Michael Scott Carpenter testified on behalf of Castle Music, formerly known as Castle Communications. Of the four depositions of foreign licensees of Nestshare, the court finds this testimony to be the least helpful. The Castle records produced by Mr. Carpenter at his deposition do not list each product by album title and do not include all of the Gene Pitney product released by Castle under its Nestshare license. (Carpenter Dep. at 18) Mr. Carpenter testified only about Gene Pitney product that had been released by Castle since late 1996. Nevertheless, Mr. White estimated that all Gene Pitney prod-

uct released by Castle had sold 35,000 units between 1992 and 1999. Mr. Carpenter testified that, of the products he testified about, none had, at that point, sold more than 3,500 units. *See* Carpenter Dep. at 9–13.

The court also finds Mr. White's estimate of 15,000 as the minimum number of units that a record company would produce unreliable. Ms. Booker of Reader's Digest testified:

Q. When these records are manufactured, for example The Very Best of Gene Pitney, who manufactures them for Reader's Digest?

A. We have a variety of suppliers that actually manufacture for us.

Q. To what quantities are they manufactured?

A. It would depend on the intended use of that particular product as to what quantities we would manufacture.

Q. Let's try Pitney. In what quantity was it manufactured?

A. Are we talking cassettes and CDs?

Q. Yes.

A. **We would look to produce a minimum quantity, usually of about a thousand of each, maybe five hundred cassettes and a thousand**

36. Counsel for the Lytle defendants asked only about the seven products of The Shirelles listed in Mr. White's report and schedules that had been prepared prior to Mr. Churchill's deposition on November 30, 1999. However, all but two of the nine products of The Shirelles listed on Mr. White's January 4, 2000 schedule of additional items, *see* Trial Ex. 64, Ex. 2, are listed on Mr. Churchill's summary of sales. *See* Churchill Dep., Ex. 5. Of these seven products, the products sold as follows from the release date (which appears after the album title in parentheses) until June 30, 1999: Early Girls, Vol. I (9/25/95)—6,340 units; Early Girls, Vol. II (6/30/97)—5,733 units; Fabulous Shirelles (10/28/91)—3,878 units; Dancing 'Til Dawn (2/28/94)—2,394 units; 20 Greatest Love Songs (4/27/92)—2,401 units; Club Soul (8/17/84)—8,722; and Magic Touch (8/29/86)—6,499 units. *See* Churchill Dep.Ex. 5. As for the two other products listed on Mr. White's January 4,

2000 schedule, these products are apparently no longer in Ace Records' catalogue. *See* Churchill Dep. at 14 and Ex. 1.

37. Although he was unable to cross-reference the product identified as SEECD313 with the title of an actual Gene Pitney album, Mr. White's schedules reveals that the only See for Miles product listed is Gene Pitney's "Gene Pitney—The E.P. Collection." *See* Trial Ex. 64, Ex. 1, Schedule 1, at 21.

38. Mr. Rye also testified that See for Miles had released a product, "The Shirelles—The EP Collection." According to Mr. Rye, "[m]ost of the EP Collection sell between three thousand and six thousand units." (Rye Dep. at 15–16) Mr. White estimated that this product had sold 35,000 units. *See* Trial Ex. 64, Ex. 1, Schedule 2 at 1.

CDs as an initial quantity, because this particular product was produced solely for a very low key promotion.

Q. What do you mean by 'a very low key promotion?'

A. In Reader's Digest we have two types of activity; one is what we call our main campaign activity, and the actual titles that are produced there are produced initially to do a test mailing to a sample group of names from our database, and, if that mailing is successful, it then goes on to be what we call 'bulk mailed', in which case we would expect to sell a significant quantity. But the other type of activity is for a smaller configuration set, such as Gene Pitney, which is only three CDs as opposed to our larger sets, and this particular product would be produced just really to be sold within our catalogue, and the catalogue is a much lower or a smaller scale business and it is a catalogue that is sent only to orderers or people that have actually made a payment. It has various uses within the business, but it is a much lower key activity than a general mailing.

(Booker Dep. at 25–26 (emphasis added)) Mr. Rye testified that his minimum manufacturing quantity is 2,000 units because, with an order of 2,000 units, he gets free glass mastering. (Rye Dep. at 15) The testimony by these foreign licensees is in dramatic contrast to Mr. White's assumption that record companies would produce, at a minimum, 15,000 units of each and every recording.[39] The court is also skeptical of these estimates in light of testimony that, in the event these record companies were not known to the plaintiffs' experts, they estimated sales at 15,-000 units. *See* Trial Ex. 64 at 5; Tr. at 230. Mr. Hughes testified that he made these estimates even though "he had no

way of knowing whether the 150 companies [he] had never heard of had financially worthwhile projects." (Tr. at 230) Defense expert Bonetti testified that, as a licensor, he would seek an advance to cover at least 5,000 units for a full-priced product and an advance to cover at least 10,000 units for a budget product. (Tr. at 745–46)

The court finds that the plaintiffs' experts have provided no reasonable basis for estimating that each product containing the plaintiffs' master recordings would sell 15,000, 35,000, or 50,000 units. The testimony of the four foreign licensees indicates that product containing the plaintiffs' master recordings sold, as a result of foreign exploitation, an average of 5,000 units.

In evaluating the plaintiffs' experts' estimated number of units sold, the court also looks to the actual Nestshare accounting records. *See* Trial Ex. 3N. The plaintiffs' experts failed to utilize available records from Nestshare showing actual sales in order to estimate sales more accurately. After trial, the court ordered the plaintiffs to submit a table comparing the number of units sold of the plaintiffs' products according to Nestshare's royalty statements to the estimated number of units sold according to the plaintiffs' expert schedules. The plaintiffs submitted a "Comparison of Units on Plaintiffs' Exhibit 64 and Defendants' Exhibit 3N." *See* Docket No. 287.

A review of the comparison chart reveals that the Nestshare royalty statements are not complete, as the plaintiffs have identified products containing the plaintiffs' master recordings for which there are no corresponding royalty statements. It appears that some licensees are not represented at all on the Nestshare royalty statements and, for some licensees, certain products were not listed on the statements. In addition, no royalty statements were provided for 1998 and 1999.

---

**39.** Three of the four foreign licensees deposed stated that they had not been contacted by Mr. White and/or Mr. Hughes about the number of units actually sold of product contain-

ing the plaintiffs' master recordings. *See* Booker Dep. at 7–8; Churchill Dep. at 53; Carpenter Dep. at 16.

The court was able to compare the number of units sold for those products for which there was both an estimated number of units sold and an actual number of units sold as reflected in the Nestshare royalty statements. For products where the plaintiffs estimate that 50,000 units were sold during the relevant time period, the Nestshare accounting statements reveal that these products sold, on average, a total of 22,672 units. For the estimates of 35,000 units, on average only 20,466 units were sold. For the estimates of 15,000 units, on average 12,858 units were sold.

The court finds that, in light of the disparity between the estimated number of units sold and the actual number of units sold as reflected in the Nestshare royalty statements, and the lack of proof by the plaintiffs that the Nestshare royalty statements are not accurate, the plaintiffs' estimated number of units sold cannot be used to calculate the plaintiffs' damages. Furthermore, although the testimony from the four foreign licensees indicated that the products containing the plaintiffs' master recordings have sold, on average, only 5,000 units, these four licensees do not appear to reflect how the plaintiffs' products have sold generally. Accordingly, for the plaintiffs' products 1) connected to the Sehorn defendants and 2) connected to the Lytle defendants through its licensing relationship with Nestshare and for which there are no Nestshare royalty statements to demonstrate that the plaintiffs have been paid for these products, the court will estimate the number of units at 23,000 instead of 50,000, 20,000 instead of 35,000, and 13,000 instead of 15,000.

### 4. Total Royalty Income

The court finds that, in light of the unreliability of Mr. White's schedules, in-

cluding the failure to provide release dates and to compute damages consistent with release dates and the lack of support for the estimated sales, the plaintiffs are not entitled to the $5,558,586 in damages requested. (Trial Exs. 64, 64.1)

The court does credit the testimony of defense expert Bonetti, who testified that a fifteen-year non-exclusive license of the Springboard masters would generate gross income in excess of $3 million and that an exclusive license would generate more. (Tr. at 751) The record clearly establishes that the master recordings of these artists are still very valuable. Indeed, Mr. Bonetti testified that the "Springboard catalog is the second most valuable catalog not controlled by the majors in the United States", and the "Springboard catalog includes primarily the Scepter and Musicor catalogs." (Tr. at 750) According to Mr. Bonetti, Gene Pitney is one of the three most valuable artists in the Musicor catalog. (Tr. at 750) B.J. Thomas and The Shirelles are two of the four most valuable artists in the Scepter catalog. (Tr. at 750–51) Furthermore, defense expert Mr. Steven Riley testified that most of the income generated for Gusto Records by foreign exploitation is attributable to the plaintiff artists. (Tr. at 1037)

As discussed in Section C above, the Lytle defendants are responsible for the exploitation of the plaintiffs' master recordings by the Sehorn defendants. Based on the court's calculations, the plaintiffs are owed $504,288 as a result of the exploitation by the Sehorn defendants, with $9,311 owed to Hank Ballard, $74,556 owed to B.J. Thomas, $130,528 owed to The Shirelles, and $289,893 owed to Gene Pitney.[40] As a result of the exploitation by the Lytle defendants for which there appear to be no Nestshare royalty statements,[41] the plaintiffs are owed $581,037,-

---

**40.** Bonetti testified that a 15-year non-exclusive license would generate $3 million in gross income to a licensee. Thus, using this estimate for the period at issue in this case, a non-exclusive license would generate approximately $1.6 million in gross income (8/15 of $3 million) and 50% of that figure is $800,-

000, which would represent the Sehorn royalty income due the plaintiffs. The court finds the disparity in these estimated figures to be negligible.

**41.** The court has also eliminated from the plaintiffs' schedules all entries where High-

with $12,196 owed to Hank Ballard, $14,400 owed to B.J. Thomas, $121,162 owed to The Shirelles, and $433,459 owed to Gene Pitney.

The Lytle defendants have already paid the plaintiffs $321,882.15 [42] for the foreign exploitations of their master recordings since January 1, 1992, and the court has not estimated any damages for the products for which the defendants have already paid royalties. (Ct.Ex.2) However, the court has estimated damages for the years 1998–1999 and it appears that, since the sale of the plaintiffs' master recordings to Catalogue Music, Vernon McFadden has negotiated one royalty check sent by Mr. Hawkins in December 1999 in the amount of $11,183.20. (Docket No. 276) [43] Accordingly, the amount awarded to Vernon McFadden will be reduced by the amount of the negotiated check from Catalogue Music.

### E. *Individual Liability of Lytle*

#### 1. *Choice of Law*

Alleging that the corporate veils should be pierced, plaintiffs seek a finding that Lytle is individually liable for any amounts this court finds are owed by GML and Gusto to the plaintiffs for the exploitation of the plaintiffs' master recordings under the Thomas and Ballard Agreements. [44]

In order to determine whether the corporate veil of a corporation should be pierced, the court must first determine which state law to apply. The plaintiffs have argued that this court should apply the law of the states of incorporation of GML and Gusto, Missouri and Tennessee respectively. The defendants contend that this court should follow the choice of law provisions in the underlying agreements. In the Thomas Agreement, the parties agreed that all disputes would be governed by Tennessee law. In the Ballard Agreement, the parties agreed that all disputes would be governed by New York law.

Because this case is before the court by virtue of its diversity jurisdiction, the court must apply the conflict of law rules of the state in which it sits. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 490, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Johnson v. Ventra Group, Inc.*, 191 F.3d 732, 738 (6th Cir.1999). Tennessee follows the rule of *lex loci contractus*, whereby it is presumed that a contract is to be governed by the law of the jurisdiction in which the contract was executed, absent a contrary intent. *See Ohio Cas. Ins. Co. v. Travelers Indem. Co.*, 493 S.W.2d 465, 467 (Tenn.1973). Where the parties have designated in the contract a specific choice of law to govern the contract, that choice will be upheld "when

---

land is listed as the licensor. The testimony at trial was clear that Highland had an exclusive domestic license with Gusto and GML. In addition, the court did not estimate damages for those products where "Defendant Co." is listed as the licensor because the plaintiffs failed to establish that these products were distributed outside the United States. For example, one product, "20 Greatest Hits: 1958" is listed as being licensed by "Defendant Co." *See* Trial Ex 64, Ex. 3, Schedule 2 at 1. However, the plaintiffs also submitted this product during trial. The compact disc case clearly states that the product was licensed by Highland. *See* Trial Ex. 15.7. Finally, the court did not estimate damages for those products that the plaintiffs failed to connect to the defendants. For example, "Best of Gene Pitney" was licensed by Evasound Records and Tapes and released on January 1, 1988. *See* Trial Ex. 64, Ex. 2,

Schedule 1 at 3. There is no evidence in the record to connect this product to the defendants.

**42.** The breakdown of this figure is as follows: Hank Ballard—$13,932.97; The Shirelles—$104,468.55; Gene Pitney—$181,198.19; and B.J. Thomas—$22,282.44. (Ct.Ex.2)

**43.** On April 17, 2000, Defendants filed a Motion to Supplement Record (Docket No. 276), to which the plaintiffs responded (Docket No. 277). This motion will be granted by separate order, insofar as the defendants will be given a credit for the $11,183.20 check paid to the plaintiff Vernon McFadden and negotiated by him.

**44.** Lytle is not a party to the Thomas and Ballard Agreements that the plaintiffs allege have been breached. (Trial Exs. 3 and 4)

made in good faith and when the other state had some material connection with the transaction. This has usually been construed to mean that the other state must have some direct and relevant connection with the transaction and that the choice of its law was not merely a sham or subterfuge." *Goodwin Bros. Leasing, Inc. v. H & B Inc.*, 597 S.W.2d 303, 306 (Tenn. 1980) (citing RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 187(2)).[45] *See also Arcata Graphics Co. v. Heidelberg Harris, Inc.*, 874 S.W.2d 15, 27 (Tenn.Ct.App.1993) ("Generally, Tennessee honors the choice of law by contracting parties so long as the transaction bears a reasonable relation to the state whose law is chosen.").

■ With respect to the choice of law provision in the Ballard Agreement, the court finds that it should be upheld and Tennessee law should be applied. Tennessee clearly has a substantial relationship to the parties and the transaction in that Gusto is a Tennessee corporation, and the plaintiffs' master recordings are located at the principal place of business of both Gusto and GML in Nashville, Tennessee.

■ However, the court finds that the choice of law provision in the Thomas Agreement should not be upheld and New York law should not be applied in determining whether the corporate veils of Gusto and GML should be pierced. New York does not appear to have a direct and relevant connection with the parties or the underlying agreement. Furthermore, GML is a Missouri corporation and, as such, Missouri has a substantial interest in whether GML's corporate veil is pierced. *See United States v. Daugherty*, 599 F.Supp. 671, 673 (E.D.Tenn.1984) (applying Kentucky law to determine whether corporate veil should be pierced because corporation was incorporated in Ken-

tucky); *Soviet Pan Am Travel Effort v. Travel Committee, Inc.*, 756 F.Supp. 126, 131 (S.D.N.Y.1991) ("Because a corporation is a creature of state law whose primary purpose is to insulate shareholders from legal liability, the state of incorporation has the greater interest in determining when and if that insulation is to be stripped away."). *See also* 1 FLETCHER CYCLOPEDIA OF PRIVATE CORPORATIONS § 41.90 (perm. ed. rev.vol.1999) ("Although the choice of which state's law is to be applied in a diversity case is determined by the law of the forum state, the state of incorporation has the greater interest in determining when and if the corporate veil is to be pierced."). The court finds that Missouri law should be applied because Missouri, as opposed to New York, has the greater interest in whether GML's corporate veil is pierced.

### 2. *Tennessee Law/Ballard Agreement*

■ Under Tennessee law, it is presumed that a corporation is a distinct legal entity, separate from its shareholders, officers and directors. *See Schlater v. Haynie*, 833 S.W.2d 919, 925 (Tenn.Ct. App.1991). However, the "owners of a corporation may be held liable and the corporate entity 'may be disregarded upon the showing of special circumstances such as, that the corporation is a sham or a dummy so that failure to disregard it would result in an injustice.'" *Durham v. Dormer Enterprises, Inc.*, 1992 WL 97075, at *7 (Tenn.Ct.App.1992) (quoting *Electric Power Bd. of Chattanooga v. St. Joseph Valley Structural Steel Corp.*, 691 S.W.2d 522, 526 (Tenn.1985)). The party seeking to negate the separate existence of the corporate entity has the burden of proving sufficient facts to justify the piercing of the

---

**45.** Restatement (Second) of Conflict of Laws § 187(2) provides:

The law of the state chosen by the parties to govern their contractual rights and duties will be applied ..., unless either

(a) the chosen state has no substantial relationship to the parties or the transac-

tion and there is no other reasonable basis for the parties' choice, or

(b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest that the chosen state in the determination of the particular issue....

corporate veil. *See Schlater*, 833 S.W.2d at 925.

 Where the corporate entity is an instrumentality of the shareholders, the corporate veil can be pierced and liability can extend to the shareholders. In *Kinard v. Cook*, the court highlighted certain factors to be considered when determining whether the corporate veil should be pierced, including

> not only whether the entity has been used to work a fraud or injustice in contravention of public policy, but also: (1) whether there was a failure to collect paid in capital; (2) whether the corporation was grossly undercapitalized; (3) the nonissuance of stock certificates; (4) the sole ownership of stock by one individual; (5) the use of the same office or business location; (6) the employment of the same employees or attorneys; (7) the use of the corporation as an instrumentality or business conduit for an individual or another corporation; (8) the diversion of corporate assets by or to a stockholder or another entity to the detriment of creditors, or the manipulation of assets and liabilities in another; (9) the use of the corporation as a subterfuge in illegal transactions; (10) the formation and use of the corporation to transfer to it the existing liability of another person or entity; and (11) the failure to maintain arms length relationships among related entities.

*Kinard v. Cook*, 1991 WL 27378, at *4 (Tenn.Ct.App. Mar.6, 1991) (citing *Federal Deposit Ins. Corp. v. Allen*, 584 F.Supp. 386, 397 (E.D.Tenn.1984)). The Sixth Circuit recently held that Tennessee law still requires an element of fraud in order to justify piercing the corporate veil. *See IBC Mfg. Co. v. Velsicol Chem. Corp.*, 187 F.3d 639, 1999 WL 486615, at *4 (6th Cir. July 1, 1999) (unpublished); *Schlater*, 833 S.W.2d at 926; *Anderson v. Durbin*, 740 S.W.2d 417, 418 (Tenn.Ct.App.1987); *Electric Power Bd. of Chattanooga*, 691 S.W.2d at 526.

### 3. Missouri Law/Thomas Agreement

 Under Missouri law, a court will pierce the corporate veil of a corporation if it is demonstrated that:

1) Control, not mere majority or complete stock control, but complete domination, not only of finances, but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own;

2) Such control must have been used by the corporation to commit fraud or wrong, to perpetrate the violation of statutory or other positive legal duty, or dishonest and unjust act in contravention of plaintiff's legal rights; and

3) The control and breach of duty must proximately cause the injury or unjust loss complained of.

*66, Inc. v. Crestwood Commons Redevelopment Corp.*, 998 S.W.2d 32, 40 (Mo.1999). A finding of actual fraud is not required for a court to hold shareholders individually liable. *Id.* at 41.

### 4. Analysis

 Here, the evidence establishes that Lytle dominates and controls GML and Gusto to such an extent that these two corporations have no "separate existence" of their own. Lytle makes all important decisions concerning the activities of these corporations. (Tr. at 470–73) Lytle owns all the shares of stock of these corporations. (Tr. at 443) Lytle is the president and appears to be the only member of the boards of directors of these corporations. (Tr. at 443) All of Lytle's corporations, including GML and Gusto, have their principal place of business at 1900 Elm Hill Pike in Nashville, Tennessee.[46] (Tr. at 442)

---

46. Lytle also owns Nashville Quality Duplicating, Inc. ("NQD") and International Marketing Group, Inc. ("IMG"). He is the president and sole shareholder of these companies which also are located at 1900 Elm Hill Pike in Nashville, Tennessee. (Tr. at 465, 469)

The court finds most troubling Lytle's clear domination and control over his financial operations and his clear direction of his accountant, Mr. Dennis Hundman, whose office is in St. Louis, Missouri. Hundman has been Lytle's accountant for over twenty years. (Tr. at 493)

In a series of questions concerning Hundman's preparation of the books and records for the various Lytle entities, Hundman revealed the measure of Lytle's control over these companies. The deposition reads:

Q. You totally rely on your client and/or your client's representatives to give you information to put in the typical books and records that you maintain on behalf of Mr. Lytle?

A. That's correct.

Q. If the information that you received is not accurate, would you have any way of knowing that, Mr. Hundman?

A. Well, that is where—you compare the ending balances of—the general ledger reflects ending cash balance and that would be compared to the bank reconciliations. And the ending accounts payable balance in the general ledger would be compared to the detailed list. When they are not in agreement, we review the transactions to determine why they are not in agreement.

Q. You rely on Mr. Lytle and his various company's (sic) representatives to give you the information you need in order to prepare those books and records?

A. Yes, we do.

Q. If the information you're given is not correct, how would you determine whether the information you were given is correct?

A. Well, we would compare the general ledger balances to supporting documentation and make sure they are in agreement. If they are not in agreement, to reconcile them.

Q. In the circumstances we've discussed, you've reconciled by going back and making book entries that would reconcile those differences. . . .

A. Correct.

Q. The reconciliation you performed were at the instructions of your client and/or your client's representatives?

A. Correct.

Q. So the term properly is that you use accounting principles to enter in the transactions that are given to you by your client or your client's representatives?

A. Correct.

Q. And you code those transactions according to what you believe they should be recorded based on the information given to you by your client and your client's representatives?

A. Correct.

(Hundman Dep. at pp. 144–146)[47]

Under the financial system in place during the pendency of this action, Lytle has failed to maintain arms-length relationships among the various entities and has used his companies to avoid his obligations to them. This testimony concerning adjustments made to the general ledger is illustrative:

Q. Under general journal entry 113, it says record portion note of assigned exchange of accounts payable.

A. Well, IMG owned (sic) NQD money for purchases. IMG owes—as a general course of business, IMG owed NQD money. NQD owed Moe money, Mr. Lytle money. In order to reduce the amounts of money that NQD owned (sic) Mr.

---

**47.** *See* Docket No. 263 (Notice of Filing Depositions with Respective Designations); Tr. at 1111–13.

930

Lytle, IMG agreed—agreed to reduce the payable to NQD. They are payable to NQD, NQD is receivable, and they agreed to owe Mr. Lytle.

Q. Where is that corresponding journal entry? ...

A. Account 210 represents amounts due to Mr. Lytle.

Q. Page 11985. Accounts payable other. IMG now owes Mr. Lytle $408,-000?

A. Correct, instead of owing NQD $408,000.

Q. So instead of owing NQD $408,000, IMG decides to take over a loan to Mr. Lytle.

A. That's right.

(Hundman Dep. at p. 109 ll. 13–25—p. 110 ll. 1–8) There is no clear justification for these financial transactions, and these types of transactions are frequently recorded in the general ledgers for the various Lytle entities.

The Lytle defendants rely heavily on the testimony of their expert, Steven J. Riley in defense. Although the court found Mr. Riley to be a credible witness and qualified as an expert in the field of accounting and auditing, it was clear from his testimony that the scope of his review of the financial records of the Lytle entities was extremely limited. Indeed, Riley testified concerning the scope of his engagement as follows:

Q. Let me go ahead to what you concluded here in your engagement here. As I understand what you have told the Court, you have come to two main conclusions. One conclusion is that the financial books and records of the various companies which you looked at were typical of closely-held corporations of approximately that size?

A. That's correct.

Q. And the other conclusion you reached was that the royalty accounting system is such that you can trace from a company's ledger to what the artists were entitled to receive?

A. That's correct.

(Tr. at 1027) In limiting the scope of the engagement to this extent, the defendants have failed to demonstrate that the financial systems in place are reliable or accurate. As Mr. Riley testified, "I looked at all of those—each company's general ledgers and cash receipts disbursements journals, general journal entries, those kind of things; but I did not audit those numbers." (Tr. at 1030). Thus, Mr. Riley took at face value what was listed in the various books and records. He did not check the accuracy of source documents. It appears to the court that Mr. Riley only traced whether the entries in the general ledgers relating to royalties appeared accurately on the royalty accounting statements for the plaintiffs' master recordings. (Tr. at 1033) In light of the very limited nature of Mr. Riley's engagement and testimony, the court finds that, with respect to the reliability of Mr. Lytle's books and records, Mr. Riley's expert opinion is of little assistance.

During closing argument, counsel for the Lytle defendants maintained that Lytle could not be held individually liable unless there was some evidence that Lytle was treating his companies as if they had no existence separate from him *in the context of paying royalties to the plaintiffs.* (2/7/2000 Tr. at 172–75) No authority was cited in support of this argument.

This court has found that there has been a breach of these agreements by the Lytle defendants and that the plaintiffs have been damaged. Thus, in the event that the plaintiffs are unable to secure payment of their judgment from GML and Gusto, the plaintiffs are entitled to recover from Mr. Lytle individually. The evidence clearly shows that Mr. Lytle has used his companies to make unjustifiable financial transactions. The corporate veils of GML and Gusto may be pierced.

*CONCLUSION*

Judgment is entered for the plaintiffs. As a whole, Plaintiffs are entitled to

$1,085,325 for foreign exploitation of their master recordings. This figure is broken down as follows: Gene Pitney—$723,352; The Shirelles—$251,690; B.J. Thomas—$88,956; and Hank Ballard—$21,507. In addition, B.J. Thomas is entitled to $85,848 for the domestic exploitation of "20 Greatest Hits of B.J. Thomas."